LEIGH B. WOODSIDE, Appellant, v. BERTHA DURHAM. — 295 S. W. 772.

Court en Banc, May 23, 1927.

1. **TAX DEED: Suit against Owner by Initials: Estoppel.** Where the deed as recorded shows the owner's full name, that is, his first or Christian name and his surname, and the tax suit is brought against him only by his initials and surname, and he is served only by publication directed to him, not by the name by which he has taken title of record, but by his initials, the judgment, rendered by default, is void, and the sheriff's deed made in pursuance thereto is likewise void and can be shown to be in a collateral proceeding; and neither he nor those claiming under him is estopped to attack the validity of the judgment by the fact that after said judgment and sale he conveyed the same land by prefixing only his initials to his surname or signature thereto. [Overruling Mosely v. Reily, 126 Mo. 124.]

2. ———: ———: **A. Willard Humphreys: Estoppel.** Where the recorded deed showed title in A. Willard Humphreys and in a tax suit the only process was constructive service by order of publication directed to A. W. Humphreys, a judgment against A. W. Humphreys, rendered by default, and a sale of the land thereunder, were void; and a later deed which in its body and certificate of acknowledgment described him as A. Willard Humphreys, but signed A. W. Humphreys, did not estop him or his successor in title from attacking said judgment and sheriff's deed as void, in a collateral proceeding to determine the title, since he, being a resident of another state, was guilty of no act or conduct upon which the State or its officers or any one claiming title under the void judgment and sale relied and acted, to their injury, inconvenience or expense, prior to the rendition of the tax judgment.

3. **ESTOPPEL: Change of Situation.** To constitute estoppel the facts alleged as constituting the plea must, as a general rule, have been relied upon by the party making the plea and caused him to change his situation, or in some way to suffer detriment or loss by reason of such reliance. Furthermore, in order to constitute equitable estoppel there must have been, not only a false representation or concealment of facts, but they must have been made knowingly by the one to be estopped and believed and acted upon by the one claiming the estoppel.

4. **SALE OF LANDS: Purchasers at Tax Sale: Partners: Title in One.** Where plaintiff became the owner of the east half of a section by direct

mesne conveyances from the patentee, and said half was sold to his alleged partner under a void judgment against his predecessor in title, and the west half was sold under a valid judgment to him and his alleged partner, and he thereafter conveyed his half interest in said west half to said alleged partner, and said partner thereupon conveyed the whole section by warranty deed to defendant's predecessor in title, the partnership being only that plaintiff and such alleged partner bought the west half together at the sheriff's sale for taxes, there is no basis for a claim that plaintiff, by executing and delivering a quit-claim deed conveying the west half to said alleged partner, authorized such partner to execute a warranty deed conveying the whole section and that plaintiff is thereby estopped to deny the title of defendant to the east half under the warranty deed or to assail the validity of the void tax judgment; and particularly so, where there is no evidence that defendant or her predecessor in title relied upon any act or conduct of plaintiff, or that either was injured or caused to change situations or to suffer loss in reliance upon plaintiff's acts or conduct.

5. TAX JUDGMENT: Against Stranger to Title. A purchaser acquires no title by sale under a tax judgment against a defendant who had no title. The grantee of a patentee who had previously by a recorded warranty deed conveyed to another acquired no title, and a sheriff's deed under a judgment for taxes against such grantee carried no title to the purchaser.

6. COLOR OF TITLE: Deed and Void Judgment: Limitations. A sheriff's deed under a void judgment for taxes is color of title to the land described therein, and adverse possession thereunder for ten years ripens into absolute title.

7. ———: ———: ———: Possession of Part: Usual Acts of Ownership. In a suit to quiet title to the east half of a section, to which plaintiff has a perfect paper title, but which was sold by the sheriff under a void judgment for taxes, the sheriff's deed attempting to convey said east half, though actually void and conveyed no title, is color of title; and where the purchaser named in said deed was the owner of the west half, and thereafter conveyed the whole section to a single grantee, and said grantee fenced forty acres of the west half and cultivated fifteen acres of it, and for twenty-five years, either he or his successors in title, either by themselves or their tenants or their licensees, have continuously since been in such possession, claiming the whole section and exercising the usual acts of ownership, such as numerous recorded conveyances of the whole, paying taxes on the whole, and occasionally cutting timber from the east half, the plaintiff, who has neither paid taxes on the east half nor exercised any claim thereto, is barred by the ten-year Statute of Limitations from asserting ownership to such east half.

8. ———: ———: ———: Paying Taxes. The payment of taxes on land for thirty-one consecutive years, by the grantee in an invalid deed and his successors in title, is, under the statute (Sec. 1309, R. S. 1919), a usual act of ownership over the whole tract.

---

Corpus Juris-Cyc. References: Adverse Possession, 2 C. J., Section 362, p. 188, n. 67; Section 507, p. 237, n. 43; Section 621, p. 276, n. 59. Estoppel, 21 C. J., Section 122, p. 1119, n. 12. Taxation, 37 Cyc., p. 1490, n. 89.

Appeal from Dent Circuit Court.—*Hon. W. E. Barton*, Judge.

AFFIRMED.

*Gratia Woodside Monegan* for appellant.

(1)  Plaintiff is not estopped to maintain this suit by reason of the fact that he may have furnished Callahan a part of the money with which to purchase the land.  Plaintiff took no title in his name, had nothing to do with the trade to Balch, did not know anything about it, said nothing to Balch whatever.  (a)  Plaintiff made a quit-claim deed to Callahan to the west half of the section, which was notice to Balch that the plaintiff was not taking any responsibility whatever in the matter.  (b)  An estoppel can only operate in favor of a party who is injured by the act of another, relies thereon and which caused him to change his situation or in some way to suffer detriment or loss, by reason of such reliance.  Wood v. Kansas City, 162 Mo. 311; Thompson v. Lindsay, 242 Mo. 76; Kline v. Groeschner, 280 Mo. 613; Guffey v. O'Reilley, 88 Mo. 429.  In order to constitute an equitable estoppel, there must be not only a false representation or concealment of the facts but they must have been made knowingly by the one to be estopped and believed and acted upon by the one claiming the estoppel.  Freeland v. Williamson, 220 Mo. 231.  (c) The defendant claims under a quit-claim deed and by taking such quit-claim deed she assumed her own responsibility for the title, agreeing to take just what title her grantor had to convey and nothing more.  Chew v. Kellar, 171 Mo. 225; Weissenfelo v. Cable, 208 Mo. 534.  (2)  It is also claimed by the defendant that the plaintiff is estopped from asserting that the tax title is bad on account of the fact that Humphreys was sued by his initials "A. W." because the title under which plaintiff claims emanated from Humphreys by a deed signed "A. W. Humphreys."  We understand that the rule established in the case of Moseley v. Reily, 126 Mo. 124, was overruled in the case of Brown v. Peake, 177 S. W. 645.  (a)  The title taken by Humphreys to the land was taken in the name of "A. Willard Humphreys;" the testimony in the case shows that he was known as "Willard Humphreys" and that was his name; and a man must be sued in his correct name, the name by which he is known, even though he may have an initial placed before it.  Nolan v. Taylor, 131 Mo. 229.  Notice to Jeff M. Thompson is good as to M. Jeff Thompson.  Nolan v. Taylor, 131 Mo. 229.  The land was not conveyed by Humphreys by his initials only.  The body of the deed recited that it was made by "A. Willard Humphreys;" it was signed "A. W. Humphreys," but the acknowledgment recited that "A. Willard Humphreys" came before the notary and acknowledged the execution of the deed.  This makes a deed from "A. Willard Humphreys" and not from "A. W."  If a grantor's name be correctly recited in the body of the deed and his correct name appears in his acknowledgment to the deed, this will cure any error made in

317 Mo.—2.

the signing of the deed. Lincoln v. Thompson, 75 Mo. 630; Houx v. Batteen, 68 Mo. 87; 1 Cyc. 586, note 20. (b) Payment of taxes and cutting of timber on land do not constitute adverse possession. Stone v. Perkins, 217 Mo. 602. (c) The possession of one tract of land will not extend to an adjoining tract, owned by a different party. Weir v. Lumber Co., 186 Mo. 397. (d) The theory of a title by limitation is that the owner of the land is presumed to see it occasionally and to know if anybody is in actual possession of it, but they are not expected to look to adjoining lands to see if there is a possession and a consequent claim of ownership. The possession of a part of a tract of land under a claim of the whole tract as provided by our statute, means a part of the tract claimed by the plaintiff. The evidence does not show any possession by defendant to the east half of Section 21; the possession being solely on the west half.

*Wm. P. Elmer* for respondent.

(1) The tax sale against A. W. Humphreys is good as against A. Willard Humphreys under the many decisions of this court. Brown v. Peake, 177 S. W. 645; White v. Gramley, 236 Mo. 648, 139 S. W. 127; Mosely v. Reilley, 126 Mo. 124; Stephenson v. Brown, 174 S. W. 414. Showing the real name of a defendant in a tax suit to be different from that used by him in his deed to the land, does not effect the validity of the tax proceedings. Shuck v. Moore, 135 S. W. 59, 232 Mo. 649. (2) The whole section has been conveyed as one tract from the time it was owned by appellant in 1893, continuously, eleven times, till the title vested in respondent. Under such circumstances it was one tract and possession of part is constructively extended over the whole by the usual and customary acts of ownership. Sec. 1309, R. S. 1919; 2 C. J. 235; Schofield v. H. L. & M. Co., 187 S. W. 61. (a) A contiguous body of land conveyed by one deed under one general description constitutes one tract and actual possession of one part will give grantee constructive possession of all. Section 21 was one tract. 2 C. J. 238; Heinerman v. Bennett, 144 Mo. 113; Herbst v. Merifield, 133 Mo. 272; Schofield v. Harrison L. & M. Co., 187 S. W. 61. (b) Possession by tenant is possession of the owner. 2 C. J. 246. (c) Possession of the part by the two tenants and the exercise of acts of ownership by respondent through her husband, Wm. Durham, for the required period, constitutes constructive possession of the tract. Durham's claim of ownership of all of Section 21 was notorious. Sec. 1309, R. S. 1919. (d) The same rule as to constructive possession applies to the thirty-year Statute of Limitation. Pharis v. Bayless, 122 Mo. 123. (3) One who being defendant in a tax sale accepts the surplus money arising after payment of taxes and costs, is

estopped from asserting invalidity of the sale. Hartman v. Horns-by, 142 Mo. 368; Clayburn v. McLaughlin, 106 Mo, 521. The acts of appellant in his purchasing the title to this land with Callahan and executing a quit-claim deed to Callahan, so that Callahan might execute a warranty deed thereto constitute an estoppel. Callahan was a trustee holding the title to the entire section, for the benefit of himself and Woodside, and his warranties were binding as an estoppel of both. 21 C. J. 1067, 1104.

SEDDON, C.—Action to determine, or quiet, the title to the northwest quarter of the northeast quarter and the south half of the northeast quarter and the southeast quarter of Section 21, Township 32 north, Range 6 west, in Dent County, Missouri. The petition, filed on October 9, 1923, is conventional, plaintiff alleging that he is the owner in fee simple of the land in controversy and that defendant is claiming title thereto, wherefore plaintiff prays the court to hear the evidence bearing upon the title to said real estate, determine the rights, claims and interests of the parties therein, and that plaintiff be adjudged to be the true, legal and absolute owner thereof and that defendant be debarred from setting up, or claiming, any right, title or interest therein.

The answer is as follows:

"Now on this day comes the defendant and for answer to plaintiff's petition admits that she has a deed of record to the lands described in the plaintiff's petition and that she is claiming title to the said lands.

"Further answering the defendant denies each and every other allegation in the plaintiff's petition.

"Further answering the defendant says that the plaintiff's cause of action, if any ever existed in his behalf, accrued more than ten years prior to the date of the filing of his petition and that the plaintiff is debarred from asserting any right, title or interest, in or to said land, by reason of the ten-year Statute of Limitations of the State of Missouri. That the defendant, and those under whom she claims title, have been in the lawful occupancy and possession of lands described in plaintiff's petition under color of title to said premises, and claiming title thereto, exclusive and hostile to the plaintiff's title, and that her claim of title has been made in good faith, believing that she had a good title to said lands and that her occupation and possession has been actual, peaceable, continuous, uninterrupted, notorious and hostile to any other right or title to said lands, for a period of ten years prior to the commencement of this action, and during all that time the defendant claimed title to said lands by deeds and color of title duly recorded upon the deed records of Dent County, Missouri, and over that part of said lands

not in the actual possession of the defendant she has exercised the usual and customary acts of ownership as are usually exercised over that character and kind of land in the vicinity where the said lands are located. That the defendant is the owner of entire Section 21, Township 32 north, Range 6 west, and that the said section constitutes one tract of land and has been conveyed as one tract of land to the defendant and those under whom the defendant claims title and was conveyed as one tract of land prior to the date of the entrance of the defendant into the possession thereof, and that the defendant has had the actual, open, notorious, hostile, adverse and continuous possession of a portion of said tract of land for more than ten years prior to the date of the filing of plaintiff's petition, and she has exercised the usual and customary acts of ownership over the remainder of the said tract of land during the said period that are generally exercised over that kind and character of land in the vicinity where said lands are located, and that she has protected the said lands against trespassers, paid the taxes thereon and performed every other act of ownership.

"The defendant further avers that the title to all of said Section 21 emanated from the United States Government more than ten years prior to the date of the filing of plaintiff's petition, and that the defendant has been in the actual and lawful possession of a portion of said lands for more than one year prior to the date of the filing of plaintiff's petition under color of title by deeds, duly recorded upon the deed records of Dent County, and under which she was claiming title to said lands, and that the defendant has been in the actual and lawful possession of a portion of the lands described in the plaintiff's petition for more than one year prior to the time of the filing of plaintiff's petition and claiming the same under color of title and exercising over that portion of land not in possession the usual and customary acts of ownership exercised over that kind and character of land in the vicinity where said land is located, and that neither the plaintiff, nor any person or persons, by, through or under whom they claim, or might claim, title, nor any person or persons claiming title by, through or under the plaintiff, or who might be claiming by, through or under the plaintiff, have been in the actual possession of the said lands for more than thirty-one years prior to the date of the filing of plaintiff's petition, nor have they during said period paid any taxes thereon. That the plaintiff's cause of action, if any he had, accrued more than thirty-one years prior to the date of the filing of his petition and he is debarred from asserting or claiming any right, title or interest in or to said lands.

"Defendant further states that on the 27th day of June, 1893, John R. Callahan and the plaintiff were partners engaged in the business of buying and selling tax lands, and that the plaintiff here-

in was a silent partner and the title to all of said lands were taken in the name of the said John R. Callahan and held in title for himself and the plaintiff, and that the lands described in the plaintiff's petition, and other lands, were purchased by the said John R. Callahan at tax sales and plaintiff paid the purchase money with the understanding and agreement between himself and the said John R. Callahan that the title should be taken in the name of the said John R. Callahan and when the lands were sold the proceeds thereof were to be divided between the plaintiff and the said John R. Callahan. That on the said 27th day of June, 1893, the said John R. Callahan sold the said lands described in plaintiff's petition to H. O. Balch, and made, executed and delivered to the said H. O. Balch a warranty deed fully describing said lands and the said H. O. Balch paid for said lands and the proceeds thereof were divided between the plaintiff and the said John R. Callahan. That the plaintiff and John R. Callahan paid the taxes on the said lands up to and including the year 1922, and that neither the said John R. Callahan nor plaintiff has paid any taxes on said lands thereafter. That the deed made by the said John R. Callahan to H. O. Balch was a general warranty deed with full covenants and warranties of title. That by reason of the acts of the plaintiff and said John R. Callahan as aforesaid, the plaintiff is now estopped from asserting any claim, right, title or interest, in or to the lands, described in his petition.

"Wherefore, the defendant prays the court to ascertain and determine and find the title to said lands and divest the plaintiff of all claim or title thereto, and vest the same in the defendant, and perfect the plaintiff's record title to said lands and for other proper relief."

The reply is as follows:

"Now comes the plaintiff and for replication to defendant's answer denies that the said defendant or any person under whom she claims has ever had possession of any part of the east half of Section Twenty-one, Township Thirty-two, Range Six, or has done any act by which she or they have acquired any title by limitation.

"On the other hand, the plaintiff states that the only act done by the defendant or those under whom she claims was to sell some of the timber growing on said land, and authorizing other parties to go on and cut and remove the same, and that the acts done under such arrangement were merely a trespass, and would not give the defendant any title whatever to the land.

"Plaintiff denies that the east half of said section and the west half are one and the same tract, and upon the other hand he states that they never have been owned by the same person.

"Plaintiff admits that the west half of said section was bought by J. R. Callahan and himself, and the deed taken thereto jointly in

about the year 1879, but alleges that he sold his interest therein to the said Callahan and made him a quit-claim deed therefor.

"Plaintiff denies that he was ever in partnership with John R. Callahan in the buying and selling of tax lands. He admits that the said Callahan did buy some land and took the deeds in his own name for which plaintiff paid part of the purchase price on sale for taxes, but as to whether the east half of Section Twenty-one was a tract so purchased by said Callahan, plaintiff is unable to find any record showing whether such is true or not, but he states to the court that if he did furnish any portion of the money to buy the said east half of Section Twenty-one, he sold out his interest therein to the said John R. Callahan before his deal thereon was had with H. O. Balch, and that if the said Callahan made a warranty deed to the said Balch, he did it of his own accord, and without any authority or suggestion from this plaintiff.

"This plaintiff had nothing whatever to do with the transaction alleged in defendant's answer regarding the sale of said land to the said Balch, and doesn't know what consideration the said Callahan received therefor, but he does know and states that he made no guaranty, either oral or written, to the said Balch as to the title of said land or anything in regard thereto.

"Plaintiff further says that at the time of the transaction between the said Callahan and the said Balch, the said east half of Section Twenty-one was the property of one MacGrane Coxe, who had purchased the same from A. Willard Humphreys by deed dated July 8, 1891, and that the plaintiff derived his title from the said Coxe.

"That neither the said Coxe nor the said Humphreys ever made any claim to the west half of Section Twenty-one, and this plaintiff purchased the east half of Section Twenty-one from the said Coxe in the month of August, 1896, long after the making of his quit claim deed aforesaid to the said Callahan for the west half and long after the said Callahan conveyed to Balch the east half of Section Twenty-one, and since which time the plaintiff has made no claim whatever to the west half of Section Twenty-one."

Plaintiff's claim of title to the real estate in controversy rests upon the following deeds, or muniments of title, all duly filed of record in Dent County, Missouri, recorded upon the deed records of said county, and put in evidence at the trial: On September 1, 1859, the United States issued to Mary Bradley, as the purchaser, a patent to the *east* half of Section Twenty-one, Township 32 north, Range 6 west, in Dent County; on January 22, 1861, said Mary Bradley, a single woman, by warranty deed filed for record on July 13, 1872, conveyed the east half of said Section 21 to William Drew; on March 6, 1873, said William Drew, a single man, by warranty deed filed for record on May 10, 1873, conveyed the east half of said Section

21 to A. Willard Humphreys of New York City, New York; on March 13, 1874, Mary McDonald, formerly Mary Bradley, and her husband, Patrick McDonald, executed and delivered a quit-claim deed, filed for record on May 12, 1874, purporting to convey the east half of said Section 21 to Solomon Bellew; on July 8, 1891, said A.. Willard Humphreys and Mary C. Humphreys, his wife, both of Brooklyn, New York, by quit-claim deed filed for record on August 5, 1891, conveyed the east half of said Section 21 to MacGrane Coxe of Tuxedo, New York; the last-mentioned deed is signed, "A. W. Humphreys," but the grantor is described in the body of the deed, and in the acknowledgment thereof, as "A. Willard Humphreys;" on August 27, 1896, said MacGrane Coxe and Lena Coxe, his wife, both of Tuxedo, New York, by quit-claim deed filed for record on December 1, 1897, conveyed the east half of said Section 21 to Leigh B. Woodside, the plaintiff herein.

Plaintiff also read in evidence a sheriff's deed, dated October 9, 1879, and filed for record on December 18, 1882, purporting to convey the east half of said Section 21 to J. R. Callahan. The said sheriff's deed contains the recitals that two separate judgments were entered on April 14 and 15, respectively, 1879, in favor of the State of Missouri, at the relation and to the use of the Collector of Revenue of Dent County, against Solomon Bellew and A. W. Humphreys, respectively, for delinquent state, county and special taxes levied, assessed and found to be due upon the east half of said Section 21 for the years 1868 to 1876, inclusive; that special executions, or orders of sale, were duly issued upon said judgments; that the east half of said Section 21 was duly levied upon and seized under said writs of execution, and the said real estate duly advertised and sold by the sheriff, under authority of said writs of execution, on October 9, 1879, to said J. R. Callahan, he being the highest bidder therefor. Plaintiff also put in evidence the order of publication and judgment by default in the tax suit, entitled, "State of Missouri, at the relation and to the use of the Collector of Revenue of Dent County, Missouri, against A. W. Humphreys," which shows that A. W. Humphreys was a non-resident of this State and was notified of the pendency of said tax suit by publication, and that the judgment by default was bottomed upon the published notice given to the defendant named therein, A. W. Humphreys.

Plaintiff also put in evidence a tax deed, dated October 8, 1879, conveying to J. R. Callahan and L. B. Woodside the *west* half of Section 21, Township 32, Range 6, under a judgment for delinquent taxes against Benjamin Barker, and special execution thereunder; also a quit-claim deed, dated July 3, 1893, and filed for record on July 6, 1893, from L. B. Woodside and wife, Martha Woodside, conveying to said J. R. Callahan, "the undivided one-half of the *west*

half of Section 21, in Township 32 north, Range 6 west," in Dent County, Missouri.

Defendant's claim of title rests upon the following deeds, duly recorded and put in evidence: On June 27, 1893, said J. R. Callahan and wife, by warranty deed filed for record on July 17, 1893, conveyed *all* of said Section 21 to H. O. Balch; said H. O. Balch and wife, by deed filed for record on November 2, 1893, conveyed all of said Section 21 to William D. Lane; said William D. Lane and wife, by deed filed for record on December 22, 1893, conveyed all of said Section 21 to Julius R. Jamble; said Julius R. Jamble, a single man, by deed filed for record on December 22, 1893, conveyed all of said Section 21 to J. R. Balch; said J. R. Balch and wife, by deed filed for record on February 1, 1895, conveyed all of said Section 21 to Mary Jane Lane; said Mary Jane Lane and husband, by deed filed for record on February 1, 1895, conveyed all of said Section 21 to W. M. Durham and Bertha A. Durham, of Kankakee County, Illinois; said W. M. Durham (or Welton M. Durham) and Bertha A. Durham, by warranty deed dated February 4, 1896, and filed for record on February 6, 1896, conveyed the purported half interest of Welton M. Durham in all of said Section 21 to Frank Hamilton; said Frank Hamilton, assignee of W. M. Durham, by deed filed for record on June 20, 1898, purported to convey all of said Section 21 to Hiram Goodwin; said Bertha A. Durham and W. M. Durham, her husband, by warranty deed dated October 4, 1902, and filed for record on October 6, 1902, purported to convey all of said Section 21 to George H. White; on March 20, 1909, the executors of the last will and testament of said Hiram Goodwin, deceased, under power of sale granted in said will, by deed filed for record on August 4, 1909, purported to convey all of said Section 21 to said George H. White; and on February 10, 1916, said George H. White, by quit-claim deed filed for record on February 23, 1916, conveyed to defendant, Bertha A. Durham, the northwest quarter of the north-east quarter, the south half of the northeast quarter, and the south-east quarter of said Section 21, being the land in controversy, to-gether with the west half of said Section 21, all in Township 32, Range 6, in Dent County, Missouri.

The plaintiff, Leigh B. Woodside, testified at the trial: "I was personally acquainted with Humphreys and I knew his name; the 'A' in his name stood for Asahel, but he was generally called A. Willard Humphreys, or Willard Humphreys; I never heard him called Asahel, but I asked him once what the 'A' was for and he told me, and that is the way I know."

The defendant's evidence tended to show that, some twenty-five or more years prior to the commencement of the instant suit, W. M. Durham, or Welton Durham, husband of defendant, allowed and per-

mitted John Schafer, Jacob Schafer and Dave Medlock to fence and cultivate two separate parcels in the *west* half of said Section 21, said tracts or parcels of land being referred to by the witnesses as "the Durham field." The Schafers and Medlock fenced and have continuously cultivated the two tracts in the *west* half of said section up to the time of the trial of the instant suit. The land comprising the whole, or, at least, the larger part, of said Section 21 is rough, wild and uncultivated, and its chief, or principal, value is because of the uncut timber on the larger portion thereof. The testimony of defendant's witnesses was to the effect that no portion of the *east* half of said section had ever been fenced, nor had any improvements of any kind ever been placed thereon. One witness testified that a few ties had been cut at one time on the *east* half of said section, presumably, but not conclusively, by Durham's permission and consent. The plaintiff, Woodside, adduced no testimony that he had ever taken or asserted actual possession of any part of the land in controversy. There is no convincing or substantial evidence in the record that any person, at any time, had taken, or exercised, actual possession over any part of the *east* half of said section. It was agreed by the parties at the trial, as disclosed by the abstract of record, that, for the year 1892, L. B. Woodside paid one-half of the taxes and J. R. Callahan paid one-half of the taxes on the land in controversy, and that, since the year 1893, the defendant, and those under whom she claims, have paid all the taxes thereon. It was also admitted that Bertha A. and W. M. Durham are husband and wife.

The cause was tried and submitted to the trial court without the aid of a jury. At the conclusion of the evidence, the court gave the following declarations of law at the request of plaintiff:

"(1) There is no evidence in the case of former ownership or interest that would create an estoppel against the plaintiff to claim the land sued for if he has the legal title thereto.

"(3) Where two judgments are rendered by a court of competent jurisdiction upon the same cause of action, the second judgment is void, the matter having been disposed of by the first judgment.

"(4) The possession of a part of a tract of land will not extend to a tract of adjoining land owned by a different person when there are no acts of possession on such adjoining land, and such possession will not put in force the Statute of Limitations.

"(5) Payment of taxes and cutting timber are not evidence of the possession of land."

The plaintiff asked, but the court refused, the following declarations of law:

"(2) The judgment under which the land sued for was sold for taxes was void, and no valid sale could be made thereunder.

"(6) Under all the evidence in this case, the plaintiff is the owner of the east half of Section 21, Township 32, Range 6 west, and is entitled to have the title quieted in his favor.

"(7) Where a judgment rendered for taxes against a party is void on account of the fact that his name was not set forth in the petition, order of publication and judgment, a purchaser from him is not estopped to claim the title because of any recital in the deed which he obtains or in the manner in which it is signed.

"(8) Where the title to land was taken in the name of A. Willard Humphreys, and was so entered of record, and if the initial "A" was for the name Asahel, but he was never called by that name, but called by the name of Willard Humphreys, a tax deed in a suit against A. W. Humphreys would not convey the title of A. Willard Humphreys to the land, where the service was by publication; and if his title was not affected by said suit and judgment, and sale thereunder, the land still belongs to him after such sale, and he could do with it as he wished, and a purchase from him where the deed recited that it was made by A. Willard Humphreys and the acknowledgment shows that it was acknowledged by A. Willard Humphreys would pass the title to such purchaser notwithstanding the fact that he signed by the initials A. W."

No declarations of law were requested by defendant. The trial court thereupon found the issues for the defendant and rendered judgment accordingly, declaring the title to the real estate in controversy to be well and fully vested in the defendant. After unsuccessfully seeking a new trial, plaintiff appealed to this court.

The original plaintiff and appellant, Leigh B. Woodside, having died during the pendency of his appeal, and his death having been suggested in this court, the cause was revived in the names of the heirs of said Leigh B. Woodside, as parties plaintiff and appellant, and they have entered their appearance herein and have been substituted as parties plaintiff and appellant in this court.

I.  The appellants assign error in the refusal by the trial court of plaintiff's requested declaration of law numbered 2, to the effect that the judgment under which the land in controversy was sold for taxes was void, and no valid sale could be made thereunder, and in **Suit by Initials:** the refusal of plaintiff's requested declaration of **Estoppel.** law numbered 8, to the effect that the record title of A. Willard Humphreys was not affected by the tax suit, publication order, and default judgment against A. W. Humphreys, notwithstanding the fact that said A. Willard Humphreys subsequently executed and signed the deed to MacGrane Coxe (under which plaintiff and his substituted heirs claim title) by the initials "A. W." Appellants also assert that the trial court erred in finding

and holding, in effect, that the plaintiff was estopped from claiming the tax judgment to be void for the reason that Humphreys, in his subsequent deed to Coxe, signed his name by his initials. The three separate assignments of error, aforesaid, will be treated and considered by us as a single assignment of error.

Respondent, on the other hand, contends that the tax judgment, and sale thereunder, against A. W. Humphreys is good as against A. Willard Humphreys, and those claiming under the tax deed, and, furthermore, that Humphreys and his successors in title, under and by virtue of the deed from Humphreys to Coxe, are estopped to question the validity of the tax proceedings and sale thereunder by reason of the fact that Humphreys executed the deed to Coxe by his initials. Respondent plants her contention squarely upon the ruling of this court in Mosely v. Reily, 126 Mo. 124. It must be conceded that the Mosely case fully supports respondent's contention. In that case, title to the land in controversy was taken in the name of Charles T. Clements, by deed duly placed of record. Subsequently, suit for delinquent taxes levied against the land was commenced against C. T. Clements, service by publication had against C. T. Clements, as the owner of the land, judgment by default rendered against him, a sale made under special execution issued upon the judgment, and a sheriff's deed delivered purporting to convey to the defendant, Reily, the interest or title of C. T. Clements. Thereafter, said Charles T. Clements, by deed which he executed by his initials, conveyed his title and interest in the land to the plaintiff, Mosely. It was ruled that the tax judgment was not subject to collateral attack by plaintiff, who was the grantee of the deed of later date.

In a later case, White v. Gramley, 236 Mo. 647, l. c. 648, this division of this court remarked: "This court has uniformly held (Skelton v. Sackett, 91 Mo. 377; Vincent v. Means, 184 Mo. l. c. 344; Williams v. Lobban, 206 Mo. l. c. 408; Evarts v. Lumber & Milling Co,, 193 Mo. l. c. 449; Proctor v. Nance, 220 Mo. l. c. 112; Spore v. Land Co., 186 Mo. l. c. 660; Turner v. Gregory, 151 Mo. 100) that, *except in cases presenting certain elements of estoppel,* publication directed to a defendant by initials in lieu of his Christian name, is wholly insufficient and a judgment rendered pursuant to such void publication is itself void." (Italics ours.)

In Vincent v. Means, 184 Mo. 327, l. c. 344, Division Two of this court said: "As a general rule the full name, that is, the first or Christian name, of both plaintiff and defendant in all judicial proceedings should be set forth in full. 'Initials are not a legal part of the name, the authorities holding the full Christian name to be essential.' [Monroe Cattle Company v. Becker, 147 U. S. 47; Turner v. Gregory, 151 Mo. 100.] It is true there is an exception to this rule where the party against whom judgment is rendered *has received deeds to*

*land, and conveyed land* using his initial letter or letters, but there was no evidence in this case that Minos C. Vincent had ever done so." (Italics ours.)

In Turner v. Gregory, 151 Mo. 100, plaintiff took title to certain land by deed, duly recorded, describing and naming him as Singleton V. Turner. Having subsequently removed to the State of California, a suit for delinquent taxes, levied against the same land, was commenced against Vaughn Turner, service had by publication, a default judgment rendered therein, and the land was sold under said judgment to defendant's grantor. Plaintiff testified at the trial that he had lived for several years in Johnson County, Missouri, some fifteen miles from the land in suit, where he had been generally known by the name of Vaughn Turner and "had answered to that name always." Said Judge GANTT, speaking for Division Two of this court: "It is at once apparent that one of the prime questions in this case is whether a suit against Vaughn Turner and an order of publication against Vaughn Turner and a judgment against Vaughn Turner is sufficient to divest the title of Singleton Vaughn Turner, whose title to the land depends upon a warranty deed to Singleton V. Turner, duly recorded prior to the assessment and levy of the taxes, which are the basis of the judgment, and prior to the commencement of the suit against Vaughn Turner. . . .

"It is a fundamental rule of our law, founded in the plainest principles of natural justice, that no man shall be deprived of his life, liberty or property without due process of law. Notice of the proceedings against him is essential to their validity. Accordingly, whenever it is feasible, our laws provide for actual, personal service on the defendant of the notice of the action, and in all proceedings the Christian and surname of both the plaintiff and the defendant should be set forth in the pleadings and process with accuracy. [Martin v. Barron, 37 Mo. l. c. 304 and 305.] When a party is sued by a wrong name and actually served with process, if he does not appear and plead the misnomer in abatement the judgment will not be void. [Corrigan v. Schmidt, 126 Mo. l. c. 311.] But a distinction exists between a case of personal service and a case where the defendant is a non-resident, where the only notice is by publication. This, at best, is but constructive service of notice, and where resort is had to this method, a substantial, even rigid, observance of the law is required, otherwise the judgment will be void. ([Hutchinson v. Shelley, 133 Mo. 400; Winningham v. Trueblood, 149 Mo. 572; Young v. Downey, 145 Mo. 250.] Hence, in notifying a person by publication, as he can only be designated by his name, if his name be omitted, or a wrong name is attributed to him, it is at once evident that he receives no notice in fact and has no opportunity of filing a plea in abatement. . . . We have then, as to this class of cases, a rea-

sonable rule for the determination of this question of the name of the owner. Apply this rule to this case and we find that the record owner of this land was Singleton V. Turner. In his deed of record he is designated Singleton V. Turner no less than four times, and strange to say he signs his own name in full after that of his grantors, making in all five times his name appears on the record to which the collector was required to go to find the owner of this land before bringing suit. It is argued, however, that he was known by his middle name of Vaughn. There is no evidence that he ever signed his name that way, nor is he responsible for the fact that others so designated him. He has done nothing to estop himself from dis-puting the validity of these proceedings against him. Not having been sued by his real name, and that name appearing of record as owner of the land in suit in the county in which he was sued, the order of publication and judgment must be held void and subject to attack collaterally as well as directly. This conclusion is in harmony with all of our decisions.''

In Stevenson v. Brown, 264 Mo. 182, the question was again discussed by GRAVES, P. J., delivering the opinion of this division of this court, thus: ''Defendants rely upon the cases of Vincent v. Means, 184 Mo. 337, and Mosely v. Reily, 126 Mo. l. c. 130. The contention of defendant is that as it appears in this record that the plaintiff had received deeds to other lands in the county in the name of 'M. E. Stevenson,' she is estopped from denying the validity of the notice by publication in the tax proceeding involved in the case at bar. We do not think that these cases go to the extent contended for by defendant. Had the plaintiff received the title to the land here involved in the name of 'M. E. Stevenson,' she would be clearly estopped under these cases. The reason for the rule is found in the statute itself, which requires these tax suits to be brought against the record owner. . . . That rule is, that if a person takes and puts of record a deed to land with his initials instead of the full name, he will be estopped from claiming the insufficiency of a notice giving his name, as found in the recorded deed, in a tax suit to enforce the lien of the State as against this particular tract of land. As to that tract of land he may be said to have adopted, as for his own, the name in the deed. But this doctrine of estoppel cannot be carried further. Thus in the Turner case, 151 Mo. l. c. 105, it was sought to invoke the doctrine contended for here, by showing that Turner used the name Vaughn, or his initials 'S. V.', in other business transactions. This was held to be of no avail.''

The precise question was last involved (so far as we find) in the case of Brown v. Peak, 177 S. W. 645, before this court in banc. In that case, a deed (involving lands other than those now in controversy) was executed and delivered to A. Willard Humphreys, as

grantee, and duly recorded. Subsequently, a sheriff's deed was executed, conveying the title of A. W. Humphreys in said land, upon a sale thereof under a judgment for delinquent taxes against him, to plaintiff's predecessors in title. Later, a quit-claim deed, signed "A. W. Humphreys," as grantor, was executed and delivered to defendant. BOND, J., wrote an opinion therein, which according to the *per curiam,* was "concurred in and adopted by the court in banc as its opinion in the case." The recorded vote of the then judges of this court shows, however, that BROWN, J., concurred in a separate opinion; and FARIS and JAMES T. BLAIR, JJ., concurred in the result; GRAVES J., dissented in a separate opinion, in which WALKER, J., concurred; WOODSON, C. J., dissented in a separate opinion; and JAMES T. BLAIR, J., in an addendum to the dissenting opinion of Judge GRAVES, "agrees, that the Mosely case (supra) is wrong and ought to be overruled." BOND, J., bottoms his opinion squarely upon the Mosely case, saying: "The case directly in point, and one which has been repeatedly affirmed as falling without the limits of the rule, is Mosely v. Reily, 126 Mo. 124. . . . For aught that appears in the record of this case, the initial A may have been the full Christtian name of A. W. Humphreys, for it is within the general, if not judicial, knowledge of this court that letters of the alphabet frequently constitute the entire Christian name of an individual. [29 Cyc. p. 269 (e):] But, however that may be, if the letter A was not the full Christian name of the said Humphreys, yet it was the name, together with a middle initial, which he signed to the deed, under which the defendant in this cause sets up title against a prior conveyance in all respects regular, through the conduit of a sheriff's deed, of all the interest and estate of A. W. Humphreys in the same land. After such an affirmance of the correctness of his own name by Humphreys, in using it to denude himself of title to the land in question, it does not lie in his mouth, nor that of any grantee from him under a quit-claim deed, to assert that the State's lien for taxes could not be enforced against the identical land by the use of the same name while it was owned by Humphreys. This case falls clearly within the principle and point in judgment before this court in the case of Mosely v. Reily, supra."

BROWN, J., in concurring, by separate opinion, in the opinion of Judge BOND, states his reasons therefor, thus: "The judgment of the circuit court is correct under the rule of this court in Mosely v. Reily, 126 Mo. 124. This much is conceded in all the opinions filed. Mosely v. Reily was decided nearly twenty years ago, and, as there is a strong probability that many land titles now rest upon the rule announced in that case, it ought not to be disturbed. Instead of changing our rule whereby vested rights may be disturbed or unsettled, it is the express policy of this court to uphold judicial sales

where this may be done without an encroachment upon some well-recognized rule of law."

Judge GRAVES, in his separate dissenting opinion in that case, said: "I desire to dissent in this case. I concede the correctness of the opinion of our Brother BOND, under the ruling in Mosely v. Reily, 126 Mo. 124. The facts in the case at bar bring it squarely within the rule of the Mosely case. I have never been able to bring myself into harmony with the rule announced in that case. . . . In my judgment, the estoppel which precludes a person from asserting the voidness of the tax judgment must be one arising from some act *prior* to the judgment; some act which *occasioned* the judgment being in the form in which it is found. The case of Elting v. Gould, 96 Mo. 535, 9 S. W. 922, illustrates my views of the kind of an act which will estop the party or his grantee from asserting the invalidity of the tax judgment. There the real owner was Richard O. Elting, but he had taken the title to the land involved in the name of R. O. Elting and had placed that title deed of record. Under our statute, R. O. Elting was the record owner and had been made such by Richard O. Elting. By putting the title of record in the name of R. O. Elting, the individual, Richard O. Elting, was estopped from saying that a judgment to enforce the State's lien against that land was void because the State had used the name that he himself had adopted as to that land, by his act of receiving and placing of record that deed. But that is not the case at bar. In the Elting case, the act which constitutes the estoppel was an act *prior* to the judgment and an act which superinduced the judgment to be in that name and form. In the Elting case the act, being *prior* to judgment, misled the officers of the State, to the State's expense and injury, and we have some grounds for the doctrine of estoppel. But an act done *after* judgment stands upon a different plane. It could play no part in the judgment and could work no injury to the State, who by the void judgment would be asserting the State's lien. In other words, an act to work an estoppel upon the right to assert the invalidity of the tax judgment must be: (1) An act with reference to the identical land; and (2) an act which was acted upon by the State *prior* to the judgment and *at the time* of the judgment, and to the State's injury and inconvenience. The foregoing views have always prevented my recognition of the rule in Mosely's case. I think that case was wrong in principle. I think further that whilst in fact the Turner case, 151 Mo. 100, does not in express terms overrule the Mosely case, yet it at least lends but little support to it. In my judgment, the rule in Mosely's case cannot stand in reason, and ought to be overruled." (Italics ours.)

In the judgment of the writer of this opinion, the dissenting opinion of Judge GRAVES in the case of Brown v. Peak, supra, is sound and

logical, and correctly applies the rule or doctrine of estoppel. I believe the case of Mosely v. Reily, 126 Mo. 124, is wrong in principle and, under the facts of that case, incorrectly applies the rule or doctrine of estoppel, as recognized and applied by the great weight of authority. I furthermore believe that the case of Mosely v. Reily, supra, should (with the concurrence of the judges of this division, of course) be expressly, pointedly and positively overruled, and that we should announce, for the aid and benefit of the bar, that that decision should no longer be followed as announcing a controlling rule or principle of law under the same, or like, facts, such as are found in the case at bar. In view of the lack of authoritative utterance by this court on the subject, and in view of the tangled, unsettled, and diversified views expressed by the several then members of this court in Brown v. Peak, supra, I think that it is high time that Mosely v. Reily, supra, be either expressly and positively overruled, or announced (as positively) to be a controlling decision in our jurisprudence, in order that there may be some certainty as to land titles dependent upon tax judgments, rendered by default, wherein the land owner is constructively served by publication notice directed against him, not by the name by which he has taken title of record, but by his initials, or some other name, entirely foreign to the record of his title. This court owes such certainty of judicial determination to examiners of land titles and to the bar of this State generally.

In the case at bar, A. Willard Humphreys, as grantee, took title by that name and placed his deed of record *prior* to the commencement of the tax suit in question. The collector of revenue, at whose relation and to whose use the tax suit was instituted by the State, had access to the deed records of the county in which the land in controversy lies. Disregarding the record ownership and title, he instituted the tax suit against A. W. Humphreys, a name entirely foreign to the title record, as defendant, attempted to procure constructive service of process by an order of publication directed to A. W. Humphreys, and procured the entry of a default judgment, under which a sale and conveyance of the land in controversy was attempted to be made. During all such time, A. Willard Humphreys, the owner of the land according to deed duly recorded upon the title records of the county, presumably (so far as the record herein discloses) was a resident of the distant state of New York. It is true that Humphreys purported to convey said land by quit-claim deed which, however, describes him, in the body of the instrument, as A. Willard Humphreys, and which is shown by the notarial certificate thereon to have been acknowledged by A. Willard Humphreys, and that, long after the tax proceedings, default judgment therein and sale thereunder, he executed and signed said quit-claim deed by his initials, viz., "A. W. Humphreys." By so doing, he did nothing to

mislead the tax officers of the State, at the expense and to the injury of the State. Neither was he guilty of any act or conduct which was relied and acted upon by the State, its officers, or anyone claiming title under the tax judgment and special execution thereunder, *prior to and at the time of the tax judgment,* to their injury, inconvenience or expense. In our opinion, estoppel does not lie against Humphreys and the appellants herein by reason of Humphreys' act or conduct in the execution of the quit-claim deed to Coxe. Our conclusions herein are therefore diametrically opposed to the previous ruling of this court, under like facts, as announced in the case of Mosely v. Reily, 126 Mo. 124, and that ruling and decision must be and is now, expressly and pointedly overruled as announcing an erroneous rule or principle of law applicable to the facts in that case.

II.   It is claimed, however, by respondent that the original plaintiff and appellant herein, Leigh B. Woodside, by reason of his partnership (so termed by respondent) with J. R. Callahan in the purchase of the *east* half of said Section 21 at the sale under execution

**Estoppel:** upon the judgment in the tax suit against A. W. Humphreys, is estopped to deny the validity of said tax judg-
**Partners.** ment and the sheriff's deed to Callahan thereunder; furthermore, respondent claims that the original plaintiff, Woodside, in executing and delivering to Callahan a quit-claim deed conveying to Callahan an undivided one-half of the *west* half of said Section 21, thereby authorized Callahan to execute and deliver a warranty deed conveying the *whole* of said Section 21, and, hence, that the original plaintiff, Woodside, is estopped to deny the title of defendant and respondent under the warranty deed of Callahan.

But the record herein discloses that plaintiff Woodside testified quite positively at the trial that he "was never in partnership with J. R. Callahan; we bought some land together, we bought the *west* half of Section 21 and the deed was taken in our joint names, and I made him [Callahan] a quit-claim deed to my half.". The plaintiff, Woodside, testified further: "He [Callahan] bought some more lands, and I paid half of the consideration, but whether the *east* half, what I am suing for, was among those lands, I am not able to say today; it might have been, I wouldn't say it was not. . . . But I never took any title to them and never authorized him (Callahan) to make a warranty deed; in fact, I told him always that he might not figure on me making anything except a quit-claim deed, and in fact I don't remember that he said anything to me about Balch or about that transaction. He [Callahan] seems to have conveyed that *whole* Section 21, *the east half and the west half,* to a man by the name of Balch and the record shows that he made a warranty deed, but it was not with my knowledge or consent, if I had any interest in

317 Mo,—3.

it.  I had an interest in the *west* half, and I quit-claimed it to him [Callahan] and if I had an interest in the *east* half, I never authorized him to make a warranty deed. . . .  But the deed that he [Callahan] made to Balch shows [a consideration of] one dollar and exchange of lands.  I never got any price to amount to anything out of it.  I don't remember whether I got anything, but the deed I made to him, a quit-claim deed to the *west* half, shows a hundred dollars consideration.''  Defendant offered no evidence in contradiction of plaintiff's testimony.  The title records tend to support plaintiff's testimony.  The sheriff's deed under the void tax judgment against A. W. Humphreys purported to convey the *east* half of said Section 21 to Callahan alone, said *''J. R. Callahan* being the highest bidder'' therefor.  The *west* half of said Section 21 was conveyed by a separate and different tax deed to J. R. Callahan and L. B. Woodside.  Subsequently, Woodside conveyed by quit-claim deed his undivided half of the *west* half of said Section 21 to Callahan.  Thereafter, Callahan, by warranty deed, purported to convey the *whole* of said Section 21 to Balch, defendant's predecessor in title.  No where do the title records disclose that Woodside had any interest or claim of title to the *east* half of said Section 21, in which is located the land in controversy, until Woodside, long afterward, placed of record the quit-claim deed from Coxe.  While it may be inferred from the testimony of the plaintiff, Woodside, that he contributed part of the purchase price paid by Callahan for the *east* half of said Section 21, yet Woodside testified positively that he never saw Balch and knew nothing about the transaction between Callahan and Balch.  There is not the slightest evidence upon the record before us that Balch, or the defendant and respondent herein, relied upon any act or conduct of the plaintiff, Woodside, or that either Balch or defendant was injured by reason of any act or conduct of plaintiff, or that either was caused to change his situation, or to suffer detriment or loss, by reason of any reliance upon the conduct or acts of plaintiff.

In Thompson v. Lindsay, 242 Mo. l. c. 76, we said: ''The virtue in the plea of estoppel lies, as a general rule, in the proposition that the facts constituting the estoppel were relied on by the party to be affected, caused him to change his situation, or in some way to suffer detriment or loss by reason of such reliance.''  To like effect is Kline v. Groeschner, 280 Mo. 599.  Furthermore, as announced in Freeland v. Williamson, 220 Mo. l. c. 231, ''in order to constitute an equitable estoppel there must have been, not only a false representation or concealment of the facts, but they must have been made knowingly by the one to be estopped and believed and acted upon by the one claiming the estoppel.  [Blodgett v. Perry, 97 Mo. l. c. 272; Scrutchfield v. Sauter, 119 Mo. l. c. 623.]''

III.  It is clear to us that respondent acquired no paper title to the land in controversy by virtue of the tax suit against Solomon Bellew, the judgment therein, and the execution sale and sheriff's deed thereunder.  Whatever title Solomon Bellew purported to have was by virtue of a quit-claim deed from Mary McDonald, formerly Mary Bradley, the original patentee of the east half of said Section 21.  Long prior to the execution and delivery of said quit-claim deed to Bellew, Mary Bradley, then a single woman, had conveyed said land, for a valuable consideration, by warranty deed, duly executed, acknowledged and recorded, to William Drew, plaintiff's predecessor in title.  Therefore, Mary McDonald (*nee* Bradley) had no title to convey to Bellew and Bellew acquired none by virtue of the quit-claim deed to him.  Having no title himself, the tax judgment against Solomon Bellew and sheriff's deed thereunder carried no title.

IV.  Respondent contends, however, that, even though the tax judgment against A. W. Humphreys, and the sheriff's deed thereunder, be held to be void, nevertheless the sheriff's deed to J. R. Callahan (the purchaser at the execution sale under said void tax judgment, and respondent's predecessor in title) gives respondent color of title to the land in controversy, and that respondent, or those under whom she claims, took possession of such land under said sheriff's deed, which possession has ripened into absolute title under the ten-year Statute of Limitation (Sec. 1305, R. S. 1919).  That the sheriff's deed to Callahan, although invalid, constitutes color of title, there can be no question.  In Hickman v. Link, 97 Mo. l. c. 488, this court has said, in discussing what constitutes color of title: "Much is said in the books as to what will and what will not constitute color of title, and many of the cases are exceptional in their character.  Generally, it may be said that any writing which purports to convey the title to land by appropriate words of transfer, and describes the land, is color of title, though the writing is invalid, actually void, and conveys no title. [Fugate v. Pierce, 49 Mo. 234; Hamilton v. Boggess, 63 Mo. 234.]"  See, also, Pharis v. Bayless, 122 Mo. l. c. 124; Heinemann v. Bennett, 144 Mo. l. c. 117; and Wilson v. Taylor, 119 Mo. 626.

It remains, therefore, for us to determine whether the judgment *nisi* is supported by substantial evidence of adverse, open, notorious and continuous possession of the land in controversy by respondent, and those under whom she claims, for a period of ten years before the commencement of the instant suit.  In determining this question, we must advert briefly to the testimony of respondent's witnesses.

The witness P. H. Schafer testified: "Q.  Now, who has been the claimer of this land in 21, that is Section 21, who has claimed it?

A. Well, Mr. Durham has been claiming that land for some time. I don't know, I don't remember just how long. Q. Well, to your knowledge, how many years has Mr. Durham claimed the land? A. Well it has been something to the rise of twenty-five years, I would judge; well, I am pretty well confident that it has been that long since he was first there. Q. Do you know what his first name is? A. Welton Durham, I think. Q. Now are there any improvements, or any of that land under fence, and any in cultivation, that is in Section 21? A. Yes, sir, there is a little that is under fence, and a little that is cultivated land, some little. Q. How many parts of it are under fence that you know anything about? A. Well, the southwest half, or the west half of the southwest quarter, there's a part of that forty, or them two forties. Q. How much is in cultivation on those two forties? A. Well, probably what has been plowed there would be something, I guess, about fifteen acres. Q. How much is under fence? A. Well, I expect there is probably forty acres. Q. How long has that land been under fence? A. Well, I could not tell you exactly. Q. Oh, as near as you can, the number of years? A. It has been in the rise of twenty years; it has been something, I rather think, twenty-six or twenty-seven years, but I wouldn't say positively. Q. That is as near as you can estimate it now? A. Yes, sir. Q. What is that field known as, what do people know that enclosure down in that country by? A. Well, they call it the Durham field. Q. Now, have you had possession of that land for Mr. Durham, for a number of years? A. Well, my father has, after Uncle John left it. Q. What did Mr. Durham say in regard to it, what arrangement did you have with him? A. Well, I don't know that I can just exactly say. Q. Oh, as near as you can? A. Anyway, Mr. Durham didn't seem to care for the cultivating of the land, or anything of the kind, just so they didn't cut the timber. I think now, I wouldn't be positive, but I think he told Pa that as far as fencing the land, he says, 'Now you can fence it, or if you want to take your fence back off of the land, that don't make a bit of difference to me.' Q. Did Mr. Durham have any of the timber cut off of this land? A. Father and Mr. Cook bought the—I don't remember how much, but I think it was the northwest quarter section, the timber off of the northwest quarter of 21, I think that is what they bought. Q. Well, this fence has been around this place continuously since the first time it was put there, was it? A. Yes, sir, the *west* half of the land; you understand, the *west* half. Q. This piece of land that you are talking about that was fenced? A. Yes, sir, it has been kept up, we kept up the fence ever since. Q. And has the land been used, in some way, in connection with farming? A. Yes, sir, there has been a little of the land used in pasture and farming." Cross-examination: "Q. There has never been any

land fenced on the *east* half of 21, has there? A. I don't think so; no, sir; there was no land fenced on the *east* half. Q. And no improvements of any kind put on it? A. No, sir."

Witness Dave Medlock testified: "Q. How long have you known Mr. Welton Durham? A. Well, as well as I recollect, about twenty-four years. Q. Do you know that Mr. Durham has claimed this land ever since you have known him, claimed to be the owner of it? A. Yes, sir, he has claimed to be the owner of 21. Q. Now have you got any part of 21 under fence and in cultivation? A. Well, I have got some, I don't know how much; ten or twelve acres that is fenced, and maybe fifteen. Q. Now, what part of that in 21 have you fenced? A. Well, it is on the southwest quarter of the northwest quarter. Q. How long have you had that fenced? A. Well, I think I fenced this—I don't know now. Q. Just guess at it as near as you can? A. About twenty-five years ago, twenty-four or twenty-five, I don't know just exactly. Q. When you found out that belonged to Mr. Durham, what arrangement did you have with him about holding the possession of it? A. I didn't have no—only when he come there and went to work, he told me if I had it fenced to go ahead and use it as pasture and whatever I wanted to use in the way I wanted to. Q. What direction did he give you, if any, in the way of timber? A. Well, I don't think he ever give me any. Q. Well, have you had that land under fence continuously since the time you first fenced it? A. Yes, sir. Q. You have used it in connection with your farm? A. Yes, sir. Q. What was Mr. Durham doing down there? A. He was prospecting for mineral. Q. Do you know of him selling any of the timber from the land, any of the rest of it that wasn't in cultivation? A. Well, I think he did; I think the timber was cut there at our place at a mill; I think Mr. Schafer sawed timber there, and my understanding is he got it from Mr. Durham. Q. What do you know about Mr. Durham looking after this land from that time on up to the present time? A. Well, I never heard him say much about it. Q. Not what he said, what did he do? A. Well, he was down there looking over the land. Q. Well, do you know, is it generally known down in that neighborhod there, where this land is located, that Mr. Durham, or the Durhams, claim this land, the entire section? A. Well, it is known with me and Mr. Schafer that he claims this; of course, the field there that they call the Durham field, pretty nearly everybody knows where the Durham field is, by that name. Q. What Durham was that named for, or called for? A. Well, I guess it was Welton. the man that was down there looking after it. Q. Is it a matter of common knowledge and repute down there in that country that Mr. Durham has been claiming that land for a number of years? A. Yes, sir." Cross-examination: "Q. Now the land that you

have fenced is in the northwest quarter of the section? A. It is the southwest quarter of the northwest quarter. Q. Has there ever been any fence on the *east* half of the section? A. No, sir. Q. Or any enclosure or improvements of any kind? A. No, sir."

Witness Jacob Schafer testified: "Q. Do you know where Section 21, Township 32, Range 6, is located? A. Yes, sir. Q. Have you got any part of that in cultivation? A. Yes, sir, about fifteen acres, in the west half of the southwest quarter. Q. How long have you had that in cultivation? A. Why, I expect somewhere along about twenty-five years. Q. What is it generally known and called by? A. It generally goes by the name of the Durham field. Q. Who was it named after? A. Well, I suppose Welton Durham. Q. How long have you known Mr. Durham? A. Well, I couldn't say, a good long bit; I guess somewhere in the neighborhood of twenty or twenty-five years. Q. Did you ever buy any of the timber off of that land from Mr. Durham? A. Yes, sir, we bought some pine timber. I think it was on the northwest quarter. Q. Do you know of Mr. Durham being down there looking after the timber that was on that land, since the time you first became acquainted with him? A. I could not say that he was looking after the timber, but he was down there and he would go over there. Q. Well, have you known of Mr. Durham claiming that land since you first became acquainted with him? A. Yes, sir, he claimed it, that is what he said. Q. Said it was his land? A. Yes, sir. Q. Now, is it a matter of knowledge and repute that this tract of land is owned by Mr. Durham, all of Section 21? A. Well, I know for myself that he claimed the land, that is all I know about it. Q. Well, the neighbors around that land? A. Well, I don't know how they looked at it. Q. You don't know how general that information is? A. No, sir." Cross-examination: "Q. Now, what you have got is in the southwest quarter, enclosed? A. Yes, sir. Q. And what Mr. Medlock has enclosed is in the northwest quarter? A. Yes, sir. Q. There is no improvement on the *east* half of the section? A. No, sir. Q. Never has been? A. No, sir. Q. Never been any enclosed? A. No. Q. And there has never been any improvements made on it? A. No, sir. Q. Or any buildings, or any cultivation or anything of that kind? A. No, sir. Q. You bought the timber on the northwest quarter? A. Yes, sir. Q. Did you cut it off? A. Yes, sir, me and John, together, cut it. Q. Someone has cut the timber off the east half, haven't they, some of it? A. Well, there has been a little cut off, or I think there was a little cut there one time when Mr. Durham was down there; Newt Hancock made a few ties. Q. There has not much been cut? A. No, sir. Q. You say that Durham had that cut on the east half? A. Yes, sir, I think some ties was made there; Newt Hancock cut some ties there, he said he did. Q.

They just went on it and cut the timber and made the ties, and hauled them off, and that is all? A. Yes, sir."

It thus appears from the foregoing testimony that Welton M. Durham, the husband of respondent and her predecessor in title, took actual possession of a part of said Section 21, through his tenants or licensees, the Schafers and Medlock, some twenty-five or more years prior to the commencement of the suit at bar; that the Schafers and Medlock fenced, enclosed and cultivated parts of the west half of said Section 21, at least twenty-five years prior to the commencement of this action, and have continuously held possession thereof, and maintained the fences and enclosures, for Durham and those claiming under him, during such period of time; that the Schafers and Medlock have held such continuous possession with the permission or sufferance of Durham; that such possession was held under claim of ownership to the whole of Section 21 by Durham; that the enclosed or fenced parts of said Section 21 were generally and notoriously known in the neighborhood of the land as "the Durham field;" and that certain timber was cut upon parts of said Section 21 by the authority and permission of Durham, including some tie timber upon the east half of said section. It furthermore appears upon the record that the *whole* of Section 21, as an entire and undivided tract, was conveyed, or purported to be conveyed, exactly ten times by deeds or instruments of title, duly filed for record, between October 9, 1879, the date of the sheriff's deed to J. R. Callahan, and February 10, 1916, the date of the deed to Bertha A. Durham, the respondent herein, on which latter date George H. White, as grantor, purported to convey to respondent the whole of said Section 21, except the northeast quarter of the northeast quarter of said section, which excepted 40 acres is not in controversy. It also stands admitted upon the record that the original plaintiff and appellant herein, Leigh B. Woodside, has paid no taxes levied and assessed against the land in controversy since the year 1892, approximately thirty-one years before the commencement of the instant suit, but that respondent, and those under whom she claims, have paid all the taxes assessed against said land since 1893 to the date of the trial of this action. Nor does the original plaintiff and appellant, Woodside, testify, or claim herein, that he was ever in actual possession of the land in controversy or that he ever exercised any act of ownership thereover.

Appellants claim that there is no evidence in the record that respondent and those under whom she claims were ever in actual possession of any portion of the *east* half of said Section 21, their possession, if any, being solely confined to small portions of the *west* half of said section, and also that the mere payment of taxes and cutting of timber on land does not constitute adverse possession

thereof. We so ruled in Stone v. Perkins, 217 Mo. l. c. 602. Respondent, on the other hand, contends that possession by respondent, and those under whom she claims, under color of title, of parts of the whole tract, in the name of the whole tract claimed, is constructive adverse possession of the entire tract.

Section 1309, Revised Statutes 1919, which is a part of our Statute of Limitations, provides: "The possession, under color of title, of a part of a tract or lot of land, in the name of the whole tract claimed, and *exercising,* during the time of such possession, *the usual acts of ownership over the whole tract so claimed,* shall be deemed a possession of the *whole* of such tract." (Italics ours.)

Construing the purport and effect of the foregoing statute, we said, in Pharis v. Bayless, 122 Mo. l. c. 123: "Counsel for defendant insist that the possession, which will enable plaintiff to maintain his action under this section [i. e., the 30-year Statute of Limitation] is an actual *pedis possessio;* that he can only recover, if at all, that land of which he had an actual possession; but we think there is no foundation for such a construction. It has long been the established rule in this State that where one enters into the possession of a portion of a tract of land under a deed, or other muniment of title, to the whole tract, *he is deemed to have seisin of the tract coextensive with the boundaries described in the deed or other muniment,* where there is no open, adverse possession of any part of the land so described in any other person. [McDonald v. Schneider, 27 Mo. 405; Fugate v. Pierce, 49 Mo. 441; Callahan v. Davis, 103 Mo. 444.]" (Italics ours.) To like effect is Heinemann v. Bennett, 144 Mo. 113.

So, this division of this court has said in Schofield v. Land & Mining Co., 187 S. W. 61, 64: "The law is well settled that the possession of a part of a tract of land with a claim of the whole, with the usual acts of ownership over the entire tract, establishes possession of the whole, and such possession will ripen into title under the Statute of Limitations. [Sec. 1882, R. S. 1909; Heinemann v. Bennett, 144 Mo. 113; Herbst v. Merrifield, 133 Mo. 267; Stevens v. Martin, 168 Mo. 407; Brown v. Hartford, 173 Mo. 183; Thompson v. Stilwell, 253 Mo. 89.]"

While payment of taxes on land has been held by us not to constitute evidence of possession thereof by the party paying the taxes, yet we have ruled that payment of taxes on land is evidence of a claim of ownership thereof. [Chilton v. Comanianni, 221 Mo. 685; Pharis v. Jones, 122 Mo. 125, l. c. 131; Carter v. Hornback, 139 Mo. l. c. 245; Stone v. Perkins, 217 Mo. l. c. 602.] The payment of the taxes on the land in controversy by respondent, and those under whom she claims, from 1893 to the date of the trial of the instant suit, inclusive, was "a usual act of ownership over the whole tract

claimed'' by respondent and her predecessors in title, within the purview of Section 1309, Revised Statutes 1919, and the evidence disclosing that respondent and her predecessors in title have been in continuous, open, notorious and adverse possession of a part of the tract described in, and purported to be conveyed by, the several deeds (which constitute color of title) under which she claims title, in the name of the whole tract claimed, respondent must be deemed to have been in possession of the *whole* of such tract, which includes the land in controversy.

The evidence is substantial enough, we think, to establish that respondent and those under whom she claims have been in open, adverse, notorious and continuous possession of the land in controversy for more than ten years before the commencement of this action and, hence, the original plaintiff and the substituted appellants are barred by the ten-year Statute of Limitation.   [Sec. 1305, R. S. 1919.]

The findings and judgment *nisi* being supported by substantial evidence, and no reversible error being found in the record, it follows that the judgment herein should be affirmed.   It is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by Seddon, C., is adopted as the opinion of the court.

Divisional opinion adopted by the Court en Banc.   All concur.