Effie M. CONRAN (J. V. Conran, Administrator of Estate of Effie M. Conran, Deceased), O. D. Bratton, Frank A. Conkling, Joseph R. Tipton, and Jeanne B. Tipton, his wife, J. Ross Holcomb, Jr., James A. Holcomb and Nolah D. Holcomb, Appellants,

v.

Georgia GIRVIN, Executrix of Estate of John L. Girvin, Deceased, Respondent.

No. 46429.

Supreme Court of Missouri,

En Banc.

Dec. 12, 1960.

Dissenting Opinion Dec. 16, 1960.

———◆———

Blanton & Blanton, Sikeston, Wils Davis, Memphis, Tenn. Merrill Spitler, J. V. Conran, New Madrid, for Davis & Davis, Memphis, Tenn. Harry C. Blanton, Sikeston, for appellants.

Web A. Welker, Portageville, Bradley & Noble, Jones & Jones, Kennett, for respondent.

STOCKARD, Commissioner.

This is a suit for the alleged wrongful cutting of timber from the land of plaintiffs. It was tried before the circuit court of Butler County without a jury and judgment was entered for plaintiff in the amount of $42,465, representing actual damages of $14,155 which were trebled pursuant to Section 537.340 (all statutory references are to RSMo 1949, V.A.M.S., unless otherwise stated). Following the entry of this judgment, Judge Randolph H. Weber, the circuit judge who heard the case, resigned. Defendant then filed several after-trial motions including a motion for a new trial. Judge Philip S. Terry, who succeeded Judge Weber as judge of the circuit of Butler County, found and determined that the land, or a substantial portion thereof, did not lie in the county from which plain-

tiffs' predecessors in title had obtained a patent, and also that the "findings and judgment of the Court rendered herein are against the weight of the evidence." He then set aside the judgment in favor of plaintiffs and ordered a new trial. It is from this order granting a new trial that plaintiffs have appealed. We shall continue to refer to the parties as in the trial court.

Plaintiffs state that a "new trial cannot possibly change the picture," and since the case will ultimately reach the Supreme Court for a decision "it might as well be decided now." They then suggest that "a review of the whole case is in order, to prevent a duplication of the same suit." Neither plaintiffs nor defendant indicate that a new trial would result in any different or additional evidence. Both parties have briefed and submitted this case to this court for final determination of the issues on the record made in the trial court. After original submission of this case a tentative opinion was prepared and furnished to counsel for the parties. The court has had the benefit of supplemental briefs and reargument. There is no occasion on this review to give deference to what would appear to be the determination of any factual issue by the trial judge entering the order from which the appeal is taken because he heard no testimony. As subsequently pointed out our conclusions are based primarily on facts revealed by maps and their interpretation by expert witnesses.

Plaintiffs alleged in their petition that they are the owners of certain described land in New Madrid County, Missouri, known as Austin Island, together with its accretions, and that in 1952 and 1953 the defendant entered upon that land and wrongfully cut and carried away timber of the value of $35,000. Plaintiffs' claim of record title is based on a patent to what is "known as Austin Island" issued by New Madrid County in 1915 to their predecessors in title. They also assert that if for any reason their record title is not valid, they own the land by adverse possession. Defendant's contentions are, in substance,

that he owns the land on which he cut timber because it is an accretion to his land; that there never was an island known as Austin Island in the Mississippi River at the place contended by plaintiffs and for that reason the purported patent to Austin Island from New Madrid County is void; that if such an island did exist it was not located in New Madrid County and said county could not give a valid patent to it; and that he, and not plaintiffs, owns the land in question by adverse possession.

Section 241.290 provides that "All lands belonging to the state * * * which have been formed [prior to 1895] * * * by the formation of islands in the navigable waters of the state, are hereby granted and transferred to the respective counties in which such lands are located * * *." Section 241.300 provides that "All lands * * * and islands which may hereafter [1895] form in the navigable waters of said state, which would otherwise have become the property of the state, shall pass in the same manner as in the case of such lands already formed, to the counties in which they are situated, * * *." Section 241.-310 authorizes the sale of such lands by

the county which has title thereto. On May 3, 1915, M. J. Conran and D. C. Kimes, plaintiffs' predecessors in title, applied to the county court of New Madrid County for a patent to "what is known as Austin Island in New Madrid County, Mo., in the Mississippi River just above Stewart's landing on the Missouri side." The county court approved the application and authorized a survey to be made at the expense of applicants. On June 22, 1915, an order was entered "that a patent be issued to M. J. Conran and D. C. Kimes to what is known and designated as Austin Island in the Mississippi River just above Stewart's Landing on the Missouri side, as per plat and survey filed, the said Conran and Kimes having paid into the county treasury the money thereof at the rate of $1.25 per acre and also having paid all incidental expenses of survey and etc. [sic] as evidenced by receipts herewith submitted to the court." On the same day the county court issued to the said M. J. Conran and D. C. Kimes a patent in which there was set forth, in the following arrangement, a description of the land to be thereby conveyed:

| "Acres | Description | Sec. | Twp. | Rng. | |
|---|---|---|---|---|---|
| 1.19 | SW corner SE SW | 16 | 20 | 14 | |
| 17.85 | Frl. SW SW | 16 | 20 | 14 | |
| 2.80 | SE corner SE SW | 17 | 20 | 14 | |
| 5.52 | Frl. SW SE | 17 | 20 | 14 | All |
| 8.74 | Frl. SE SE | 17 | 20 | 14 | Known |
| 40.00 | NE NE | 20 | 20 | 14 | as |
| 30.69 | Frl. NW NE | 20 | 20 | 14 | Austin |
| .70 | NE corner SW NE | 20 | 20 | 14 | Island |
| 21.29 | Frl. SE NE | 20 | 20 | 14 | |
| 1.60 | NE corner NE NW | 20 | 20 | 14 | |
| 2.80 | NW corner NE NW | 21 | 20 | 14 | |
| 35.19 | Frl. NW NW | 21 | 20 | 14 | |
| 11.54 | Frl. SW NW | 21 | 20 | 14 | |

in the County of New Madrid, afore——— [paper is torn] containing 179.91 acres, * * *."

———◆———

If any plat and survey were filed, as recited in the order directing the issuance of the patent, they could not be located.

However, a small "daybook" was found containing notes of Mr. Francis Steele, a surveyor who was deceased at the time of

the trial, and these notes indicated that on May 11, 1915, he made a survey of land in the area in question for M. J. Conran and D. C. Kimes. Plaintiffs urge that these notes were made by Mr. Steele when he made the survey of Austin Island in connection with the issuance of the patent. There is no reference in the notes to Austin Island by name, and the purpose of the survey is not disclosed therein. However, when the area is plotted from the notes the actual amount of land lying in the various sections correspond closely to the number of acres stated in the patent. We shall assume, as contended by plaintiffs, that these notes of Francis Steele describe the precise land purported to be conveyed by the patent, and that they constitute sufficient extrinsic evidence to explain and make certain the description in the patent.

Before proceeding further a general description of the area will be helpful, and to facilitate this explanation we have reproduced and appended hereto [1] a sketch, identified as exhibit 65, prepared by plaintiffs' expert witness W. H. Ice from the notes of Francis Steele showing his survey of Austin Island and also his survey of Williams Island which lies immediately to the west. In our discussion we shall frequently use the term "Austin Island," and in doing so we have reference to that area described by metes and bounds in the notes of Francis Steele as shown on exhibit 65. However, that described area is now a part of a larger tract of land and by use of the term we do not imply that the area is or was an island in fact. Although the patent states that the land conveyed contained 179.91 acres, plaintiffs contend that they are the owners, by reason of accretions thereto, of 563 acres.

Plaintiffs assert that at the time of the issuance of the patent the area described in Steele's notes was bounded on the north by what is referred to as the high bank chute, on the east by Austin chute, on the west by Williams chute which separated Austin

Island from Williams Island, and on the south by the Mississippi River. Immediately north of the high bank chute is what is referred to as the high bank. Defendant owns land approximately three-fourths of a mile in width north of the high bank and immediately north of the area described as Austin Island. To the east of his land is what is known as the Hunter-Conran land which is approximately a mile in width. East of that is what is identified as the M. J. Conran land. To the west of defendant's land is the Linda Harris Morris land which is approximately one-half mile in width. The area of Austin Island extends a little west of defendant's west line and about even with his east line north of the high bank chute. Therefore, if plaintiffs are correct that they are now the owners of Austin Island, and its accretions, defendant's land north of the high bank, which formerly was riparian land to the Mississippi River, is now either completely or substantially cut off from the river.

■■ The first issue for determination is whether the area referred to as Austin Island originally formed in the Mississippi River as an island in such a manner that the title thereto was vested in New Madrid County (assuming the land lay in that county). Defendant is entitled to "show by extrinsic evidence that the county did not have title to the land it conveyed." Hatch v. Rhyne, Mo.Sup., 253 S.W.2d 170, 172. Of course, if it did not, then New Madrid County conveyed no interest in the land to plaintiffs' predecessors in title by the patent. While the fact that the county had the land surveyed and then issued a patent therefor on the basis that it was an island to which it had title by reason of Section 241.290 or Section 241.300 is entitled to substantial weight, it is not conclusive on the issue of whether there was then or ever had been such an island. Chinn v. Naylor, 182 Mo. 583, 81 S.W. 1109. That issue is for the trier of the facts, which on this appeal is this court. Before discussing the evidence

I. See 341 S.W.2d 92.

on this issue we shall outline a few basic principles of law applicable to this case.

■ Title to the beds of navigable streams is in the respective states, unless granted away, "subject only to the reservation and stipulation that such streams shall forever be and remain public highways, with the right of Congress to regulate commerce thereon." 56 Am.Jur., Waters § 453; 65 C.J.S. Navigable Waters § 92; James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318. It is for each state to determine "to what extent this prerogative of the state over the lands under water shall be exercised," Hardin v. Jordan, 140 U.S. 371, 382, 11 S.Ct. 808, 812, 35 L.Ed. 428, 433, or, as stated in Barney v. City of Keokuk, 94 U.S. 324, 338, 24 L.Ed. 224, 228, "If they [the several states] choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections." See also 56 Am.Jur., Waters § 458. Some states have deemed it proper to vest the riparian proprietors with title to the bed of navigable streams above tide water. 56 Am.Jur., Waters 453; 65 C.J.S. Navigable Waters § 93(2); Annotation, 54 A.L.R.2d at p. 648; Johnson v. Burghorn, 212 Mich. 19, 179 N.W. 225, 11 A.L.R. 234. But in Cooley v. Golden, 117 Mo. 33, 23 S.W. 100, 21 L.R.A. 300, "this court followed the rule laid down in Benson v. Morrow, 61 Mo. [345] 347,—that the riparian owner only owns to low-water mark, and that the title to the land constituting the bed of the Missouri or other navigable river is in the state, * * *." McBaine v. Johnson, 155 Mo. 191, 55 S.W. 1031, 1034. Thus, unlike in some states where the state has retained full ownership of submerged lands and in which the riparian proprietor owns only to the high water mark (see Payne v. Hall, 192 Iowa 780, 185 N.W. 912; Hume v. Rogue River Packing Co., 51 Or. 237, 83 P. 391, 92 P. 1065, 31 L.R.A.,N.S., 396, 131 Am.St. Rep. 732; Winford v. Griffin, 8 Cir., 1 F.2d 224; 56 Am.Jur., Waters § 458), Missouri has elected "to resign to the riparian pro-

prietor" title to the shore of navigable streams down to the low water mark. Hauber v. Gentry, Mo.Sup., 215 S.W.2d 754; Hartvedt v. Harpst, Mo.Sup., 173 S. W.2d 65; Doebbeling v. Hall, 310 Mo. 204, 274 S.W. 1049, 41 A.L.R. 382; Frank v. Goddin, 193 Mo. 390, 91 S.W. 1057, 112 Am. St.Rep. 493; State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow, 169 Mo. 109, 69 S.W. 374; Moore v. Farmer, 156 Mo. 33, 56 S.W. 493, 79 Am.St. Rep. 504; McBaine v. Johnson, supra; Cooley v. Golden, supra; Benson v. Morrow, supra. This same rule is followed in many of the other states. Chapman v. Kimball, 9 Conn. 38, 21 Am.Dec. 707; Shaffer v. Baylor's Lake Ass'n, 392 Pa. 493, 141 A.2d 583; Reeves v. Backus-Brooks Co., 83 Minn. 339, 86 N.W. 337; Hogue v. Bourgois, N.D., 71 N.W.2d 47, 54 A.L.R. 2d 633; Gibson v. Kelly, 15 Mont. 417, 39 P. 517; Webb v. City of Demopolis, 95 Ala. 116, 13 So. 289, 21 L.R.A. 62; Lessee of Blanchard v. Porter, 11 Ohio 138; Whitenack v. Tunison, 16 N.J.L. 77; Union Sand & Gravel Co. v. Northcott, 102 W.Va. 519, 135 S.E. 589; Webster v. Harris, 111 Tenn. 668, 69 S.W. 782, 59 L.R.A. 324; 56 Am.Jur., Waters § 458; Annotation, 42 L.R.A. 174. It necessarily follows that the property line between a riparian owner on a navigable stream and the State of Missouri is the low water mark subject to certain rights in the public to navigation. See State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow, supra; Patton, Titles, 2d ed. § 297.

■ We find but one Missouri case which defines the low water mark, State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow, supra. In that case the court first discussed several early cases which held that the riparian owner owns only to the "water's edge." It was pointed out that if the "water's edge" meant the high water mark, when the water was low the riparian owner would not own to the water's edge. It was then held that the low water mark "is the only construction that can be given to the term 'water's edge'

that will at all times insure the right of the riparian owner to access to the river, and which will so define his rights as to prevent possible difficulties which would otherwise arise." [169 Mo. 109, 69 S.W. 379.] It was also held, by quoting with approval from Gould, Waters, 3rd ed. § 45, that "Fresh rivers, although not subject to the daily fluctuations of the tide, may rise and fall periodically at certain seasons, and thus have defined high and low water marks. *The low-water mark is the point to which the river recedes at its lowest stage.* The high-water mark is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and to destroy its value for agriculture." (Emphasis added.) Patton, Titles, 1st ed. § 140, defines the low water mark as "the point to which it [the water] recedes at its lowest ordinary stage, not the line of recession in an unusually dry season." See also Appeal of York Haven Water & Power Co., 212 Pa. 622, 62 A. 97. In Vol. III Farnham, Water and Water Rights, § 417, p. 1462, the low water mark is defined as "the height of the water at ordinary stages of low water." The record discloses that "mean low water" on the New Madrid gauge, only a few miles from Austin Island, was 2.2 feet, which plaintiffs assert in their reply brief was higher than "low" water (1.25 feet on the New Madrid gauge), and was "an arbitrary figure set by some one to designate to the navigation interests on the river that there was 9 feet of water in the main channel; the height considered necessary for heavy river traffic." The word "mean" as thus used is defined as "The middle point, or that which is at or near the middle point, between the extremes of place, time, number, rate, etc." Webster's New International Dictionary, 2nd ed. Therefore, mean low water would be approximately the middle point between the upper and lower extremes of low water, and we see no material difference between that and the "ordinary stages of low water" or the "lowest ordinary stage" of the water. Whether we take the definition of the low water mark from the Longfellow case,

from Farnham or from Patton it would not be higher than 2.2 on the New Madrid gauge, and we shall use that figure.

■■ The rule is that the title to an island is in the one upon whose land it appears. Vol. III Farnham, Waters and Water Rights § 850. Stated another way, title to an island in a navigable stream follows the title to the land where formed. 65 C.J.S. Navigable Waters § 115; 56 Am. Jur., Waters § 505; Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir., 190 F.2d 191; Id., 5 Cir., 191 F.2d 705; Maufrais v. State, 142 Tex. 559, 180 S.W.2d 144; State v. Imlah, 135 Or. 66, 294 P. 1046. The reason for this rule is that when an island forms from the submerged land it is a form of vertical accretion to the bed. But there is another method by which islands may form. When the river cuts a new or additional channel, not by eroding away the intermediate lands but by jumping over them or running around them and making a new and additional channel leaving a part of the land of a riparian owner intact and identifiable, then the title to that land so cut off remains in the riparian owner. De Lassus v. Faherty, 164 Mo. 361, 64 S.W. 183, 58 L.R.A. 193; Grady v. Royar, Mo. Sup., 181 S.W. 428; Miller v. Lloyd, 275 Mo. 35, 204 S.W. 257; Curry v. Crull, 342 Mo. 553, 116 S.W.2d 125; Vol. III, Farnham, Waters and Water Rights § 850; Maufrais v. State, supra; State v. R. E. Janes Gravel Co., Tex.Civ.App., 175 S.W. 2d 739; Payne v. Hall, 192 Iowa 780, 185 N.W. 912. "It is laid down by all the authorities that, if an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is the property of such riparian proprietor. He retains the title to the land previously owned by him, with the new deposits thereon." City of St. Louis v. Rutz, 138 U.S. 226, 245, 11 S.Ct. 337, 344, 34 L.Ed. 941, 949. It may be that when land of the riparian is cut off he loses title to "so much of his land as is occupied by such new bed," Maufrais v. State, supra. [142 Tex. 559, 180 S.W.2d 149], but there

is no logical reason under any principle applicable to the formation of islands why he should lose title to that portion of his land which becomes an island by such action of the river. Although such land is an island in the sense that it is a body of land surrounded by water, 56 Am.Jur., Waters § 504, it is not an island to which the county in which it was formed obtains title by reason of Section 241.290 or Section 241.300 because it did not form in that part of the bed of a navigable stream to which the state had title.

New Madrid County apparently issued a patent to Austin Island on the basis it was then in fact an island, and because the trial judge who heard the testimony found and determined that "at the time of the patent there was an island known as Austin Island offshore in the Mississippi River," we shall review the evidence on that issue, particularly the documentary evidence, and determine whether or not the land referred to in the patent and described in detail in the Steele notes in fact constituted an island in 1915.

■ Plaintiffs presented considerable oral evidence consisting primarily of the testimony of "old timers" and of their expert witness W. H. Ice, the surveyor of New Madrid County, to the effect that in 1915 the area of Austin Island was surrounded by water. However, some of the oral testimony is in conflict with plaintiffs' contentions, and much of it is vague in that it cannot be determined whether the witness was talking about conditions at "high" water or "low" water. We recognize, as did the United States Supreme Court in Stewart v. United States of America, 316 U.S. 354, 62 S.Ct. 1154, 86 L.Ed. 1529, that it is common knowledge that lands not in fact surrounded by water are sometimes called islands. Also, it is evident that the witnesses sometimes used the term "island" to refer to land that is surrounded by water only at high water levels, and that they used the term "chute" to refer to a depressed area where water

had sometime previously flowed or where it flowed only at high water levels as well as to an area where water flowed at all times. The term was also used to refer to a "finger" of water open at the river end but closed at the upper end. For these reasons, we are inclined to treat with caution oral testimony in the form of conclusions that at some particular time the witness saw or did not see an "island" or a "chute." We do not believe that the oral testimony tended to establish that the area described as Austin Island existed as an island in 1915 except possibly at high water levels. We shall briefly refer to a few isolated portions of the oral testimony in behalf of plaintiffs.

"Old timer" John Grimes testified that Austin Island first formed in 1914 and 1915 and at that time it consisted of only two or three acres. Plaintiffs' theory necessarily is that in 1915 the island consisted of almost 180 acres as indicated in the patent. Grimes at one time referred to the land as a "finger" with water only on two sides of it, and he said that the water did not go all around Austin Island except in "high" water, which plaintiffs admit in their reply brief means flood stage or 34 feet on the New Madrid gauge. Grimes later said that he did not know anything about a "finger." We mention these conflicts to show the confusion in the testimony of the witness whom plaintiffs admit in their supplemental brief was "the only witness who detailed how Austin Island originated," and to demonstrate why we, as triers of the fact, rely primarily on the documentary evidence concerning the origin of Austin Island. Probate Judge Ernie Wright testified that he had never heard of Austin Island until after this suit started but he knew of an island in the area. However, he testified that in 1914 and 1915 when the New Madrid gauge was 6 feet, one "couldn't get in there on a boat." Witness Kenneth Hall testified that when the river was "high" you could go around Austin Island in a boat, but that there was "no water at low water stage." John Greason, the county surveyor

of Butler County, testified that on April 13, 1955, "when the New Madrid gauge read 22.7" feet he went to the area, and in crossing the high bank chute he and Ice "waded water * * * that was up to the bottom of our hips," and then "waded what is spoken of as Austin chute." He then stated that "we came on high ground and hit this island," referring to Austin Island. From this testimony it is obvious that there was less than 3 feet of water in the high bank chute when the level of the water in the river was more than 20 feet above the low water mark.

We shall turn now to the documentary evidence concerning the issue of whether Austin Island was in fact an island in 1915. In support of their position, plaintiffs necessarily rely strongly on the survey notes of Francis Steele, and in their brief they say these notes show "the meander line of the island at that time," but the notes do not so state. Ice prepared a sketch showing his interpretation of Steele's notes, exhibit 65 appended hereto, and these notes show that Steele established the point of beginning as the most southern point shown by Ice on the sketch. Steele described that point in his notes as a "stake about 5⁰⁰ [chains] north from water in river." This means that the described point was about 330 feet from the water of the river at that time, and on that date the New Madrid gauge was 14 feet. Witness Ice showed this distance on exhibit 65, but we find no satisfactory explanation of how the most southern point of the area could be 330 feet north of the water in the river and constitute the boundary of an island that lay farther to the north. One call is to a "blazed line" which does not indicate the boundary of an island. No other reference is made to any point on or near the water except the call "Thence N 62° W. 24.44 to slough dividing iseland from bar SW cor. Isela." This point is identified on the sketch prepared by Ice by the words "on slough." Another call is "N 40° W 1311 to NW cor. Isela." It is apparent from Steele's notes that although some portion

of the land described by Steele bordered on a slough (plaintiffs contend it is Williams chute) the described tract of land was then a part of a larger tract of land, and we consider it to be significant that if Steele's notes purported to describe the actual water-line boundary of an island or a meander line no reference was made in the various calls to what plaintiffs contend was the "high bank chute" or "Austin chute" which plaintiffs claim to have then bordered the island on the north and east.

We turn now to plaintiffs' exhibit 58, which is a map prepared by the Mississippi River Commission and dated 1911–15. It shows that the soundings were made when the New Madrid gauge was between 12.7 and 13.5 feet. This map clearly shows that the area of accretions to defendant's land south of the high bank included the entire area of Austin Island, and possibly more, and while it also shows the existence of a slough closed at both ends north of the area of Austin Island and also north of where plaintiffs contend the high bank chute was located, it does not show the existence of an island. In fact, it clearly indicates that no such island existed.

Plaintiffs' expert witness Ice criticized their exhibit 58 as being inaccurate, but he admitted that on no other map of the area, or in any report prepared by any government agency, was there any mention made of Austin Island or of any island at that location. His explanation of this failure was to the effect that one of the principal activities of the Mississippi River Commission and the U. S. Engineers was navigation, and that the maps were prepared for that purpose. He then was asked: "Do islands have anything to do with navigation, danger signals or otherwise?" and to this question he gave the following answer: "No, Islands don't, it would be very rare that an island would affect navigation. There are islands all up and down the river and I never knew of any of them interfering with navigation." We note that exhibit 58 shows more than a dozen islands in the river, and it also labels an area as "Island

No. 13" which was then attached to the mainland.

Plaintiffs say that exhibit 58 was an "office concoction, without much attention being paid to the land area on the Missouri side of the Mississippi River" and that it mislabeled certain areas. They also assert that since it shows an area, where they say Austin chute existed, to have an elevation of 280 feet above sea level that it "appears so wrong to be absurd." But we notice that plaintiffs' exhibit 51 (a tracing made from a map dated 1885) and plaintiffs' exhibit 61 (a map dated 1929–30) show the precise elevation at the same place. In any event, exhibit 58 does not show the existence of an island; it does correspond fairly close to the call of Steele that the southern tip of the area described by him was about 330 feet from the edge of the water; and it does show the existence of the slough, or Williams chute, at the precise point referred to in Steele's notes. In fact, Ice made an overlay of exhibit 58 and drew in the area of Austin Island as he plotted it from Steele's notes, and exhibit 58 and Steele's notes show a close similarity.

Plaintiff's exhibit 61 is a map prepared by the U. S. Engineer Office, Memphis, Tennessee, and labeled "Levee and River Charts Overbank Survey 1929–30." This map shows the area of Austin Island when the New Madrid gauge was 8.7 feet, and the area is substantially the same as that shown in exhibit 58 which witness Ice criticized because it was not based, in his opinion, upon an "over the bank survey." Exhibit 61 was based on such a survey, and it affirmatively shows that no island existed where plaintiffs contend Austin Island was located. On exhibit 61 Ice drew a red line where he said Austin chute existed, but that line does not follow any depressed area shown by the contour lines. In fact it crosses directly over the highest place in the immediate area. Ice also criticized this map as inaccurate, and he gave a lengthy and complicated explanation why, in his opinion, the engineers making the map "would have missed and could not have found Austin chute."

In their brief plaintiffs say that in 1915 Mrs. Mary Harris, who then owned the land adjoining the defendant's land on the west, which is previously referred to herein as the Linda Harris Morris land, requested F. M. Robbins, a county surveyor, to see "if the lands in question, Austin and Williams Islands, belonged to her as accretions to her mainland." We find no support in the record for this statement as to the purpose of the survey, and we do not see how Austin Island could have constituted accretions to the Harris land because it did not lie between that land and the river. However, Robbins did make a survey on May 8, 1915, three days before the survey of Francis Steele. His notes indicate that he found a slough north of Williams Island and south of the Harris land, and after running a survey line south and then eastward he ended the line on what he said "appeared" to be an island. Ice drew a sketch from Robbins' notes and placed this last point on the northwestern tip of Austin Island. Exhibit 87 is a rough sketch made by Robbins on which he showed the Harris land, with accretions to the south, and then a slough with an unnamed island below it. This survey and sketch made by Robbins pertained to the conditions north of Williams Island and not Austin Island. It is important to note, however, that on page 190 of the same book in which the notes of the Harris survey appear, and immediately following them, there is a sketch, exhibit 84–4, drawn by Robbins. This sketch shows Sections 17 and 16 with a line drawn diagonally across them which other exhibits indicate represented the Mississippi River meander line of 1821. In the area above this meander line appear the initials "J.L. G." which refer to the defendant because it is undisputed that this area was his mainland property. Drawn approximately at right angles to the meander line are two lines extending southerly to a line running generally east and west and which obviously represents the river bank. This bank is shown to be approximately nine-tenths of a mile below the southern boundary of Section 17, but on exhibit 49, which was prepared by Ice to show the precise location

of Austin Island, and on exhibit 65, a copy of which is appended hereto, the northern part of that area is shown to be a part of Sections 17 and 16, and all of Austin Island would be north of a line nine-tenths of a mile below said sections. Therefore, it appears that on May 8, 1915 Robbins drew the lines on exhibit 84-4 to indicate the accretions to defendant's land extended all the way to the river, which included the area of Austin Island, but he did not show the existence of an intervening island. It is also significant that a sketch, exhibit G, made in 1914 by a surveyor by the name of W. B. Rossiter of the accretions to defendant's land also failed to show an island below the land of defendant. Plaintiffs criticize the Rossiter survey and sketch and contend that the distances and acreage are wrong, but it does agree with the Robbins sketch in that both failed to show an island where plaintiffs contend Austin Island then existed.

Turning now back to plaintiffs' exhibit 58, the 1912–15 map of which Ice was so critical, we find that what Robbins drew on his two sketches is substantially what is shown on that map; that is, Williams Island was separated from the Harris land by a slough or chute at the place shown by Robbins, but that there was no island south of defendant's mainland.

We shall not speculate as to what Steele surveyed, on May 11, 1915, but we are convinced that his notes do not show a survey of an island. Neither are we inclined to go along with plaintiffs' position that every government map which they consider to support their position is accurate beyond question, but that exhibit 58, which was introduced in evidence by them and is the most crucial map in point of time of preparation, is an "absurd" "office concoction" totally unworthy of belief. After a careful study of the voluminous testimony and the myriad of exhibits, we conclude that the area described by metes and bounds in the notes of Francis Steele did not constitute the boundary of an island in existence in 1915, but that it was a part of a larger tract of land which was then attached, except possibly at high water, to that part of the mainland belonging to defendant.

This conclusion, however, does not necessarily dispose of the issue as to the ownership of the area known as Austin Island. If it originally formed in the Mississippi River as an island, New Madrid County obtained title to it and also to the accretions thereto, and if the island by reason of accretions subsequently united with the mainland, the owner of the mainland and the owner of the island would have title in their respective sides to the place where the land joined. Hauber v. Gentry, Mo.Sup., 215 S.W.2d 754; Point Prairie Hunting & Fishing Club v. Schmidt, Mo. Sup., 44 S.W.2d 73, 75; Vol. IV Tiffany, Real Property 3rd ed. § 1228. We shall therefore determine whether Austin Island formed originally as an island in that part of the Mississippi River to which the title to the bed was in the State of Missouri, or, in other words, below the low water mark.

Plaintiffs first offered a map published by the Mississippi River Commission showing the conditions as of 1880. On exhibit 48, an enlargement of a portion of that map, Ice drew in the outline of Austin Island, and he placed the area completely in the river where he admitted there is no indication whatever of any island formation. Plaintiffs then presented exhibit 51, a tracing Ice made from exhibit 53 which was a photostatic copy of a part of a map he procured from the U. S. Engineer's Office in Memphis, Tennessee, the original topography of which was taken in 1884 and 1885 when the New Madrid gauge was between 12.9 and 13.5 feet. On this tracing Ice drew in the outline of Austin Island with a dotted line. We have reproduced a portion of this exhibit and it is appended hereto.[2] By reference to the exhibit it can readily be seen that the northern part of

2. See 341 S.W.2d 93.

the area referred to as Austin Island was then a part of defendant's land by reason of accretions thereto. The dotted line indicating the area of Austin Island, as drawn by Ice, extends into defendant's land. There was no indication of a channel for water around and to the north of the area of Austin Island, and the contour lines do not indicate the existence of Austin chute or the high bank chute. The finger of water extending northeastward from the center of the area of Austin Island resulted in a peninsula extending into the southeastern area of the outline of Austin Island. The depth of the water back in this finger is not shown, but on exhibit 53 it is shown that at its mouth the depth was three feet on the north side, four feet in the middle and eight feet on the south side. Therefore, at "mean low water" the mouth of the finger at its deepest part would be dry. This necessarily means that insofar as shown by exhibits 51 and 53 the title of defendant, which extended to the low water mark, crossed the shallow finger of water, at least at the mouth of the finger, and included that part of the peninsula southward and eastward to the property line between defendant's land and that known as the Hunter-Conran land. This follows as the result of the rule in Missouri that title of the riparian owner extends to the low water mark. The riparian owner "is entitled to access to the waters," State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow, supra, 169 Mo. 109, 69 S.W. 374, 377, and if his title does not reach the water he cannot have access thereto without being a trespasser.

Near the tip of the peninsula is shown what Ice called a "group of willows," and according to plaintiffs this was the "starting point, or nucleus, of Austin Island." Ice expressed the opinion that the area of this group of willows was later cut off and surrounded by water as an island which developed into Austin Island. As will subsequently be seen in connection with the discussion of the map of 1902, we think this is what happened, but because this nucleus was a part of the land above the low water mark to which defendant had title we disagree with Ice in his conclusions as to who thereafter would be the legal owner. We note that in plaintiffs' supplemental brief they argue that all of the peninsular bar washed away, including what Ice called the nucleus of Austin Island, and that the area of Austin Island and Williams Island redeveloped from a "submerged bar." This is highly speculative, and not borne out by plaintiffs' own exhibits.

Plaintiffs invite the court's attention to defendant's exhibits FF and GG, which are the same as exhibit 53 from which Ice traced exhibit 51, and they state that these exhibits show "the nucleus of Austin Island as a clump of trees, with the chute around it, out in the river, or on a sand bar." These exhibits clearly do not show "the chute" or any chute "around" the clump of trees. Neither do they show the clump of trees to be "out in the river." Reference to exhibit 51 will readily disclose that the clump of trees was near the tip of a peninsula which was one-half mile in width and attached and contiguous to the mainland. The area of the peninsula immediately to the east of the clump of trees was 5 to 15 feet higher than the area with the trees, and 15 to 20 feet higher than the water which was at least 10 feet above mean low water. Therefore, it was not an area temporarily exposed by low water.

Plaintiffs seem to take the position that if the peninsula was of sand that what Ice called the nucleus of Austin Island was an island in fact because the intervening one-half mile wide sand bar did not result in the area being attached to land. This is material only if the nucleus of Austin Island was not an accretion to defendant's land, and we hold that plaintiffs' exhibits 53 and 51 reveal it to have been. " 'Generally, accretion is the increase of riparian land by the gradual deposit, by water, of solid material, whether mud, *sand* or sediment, so as to cause that to become

dry land which was before covered by water.'" (Emphasis added.) Jones v. Turlington, 243 N.C. 681, 92 S.E.2d 75, 77; Smith v. Whitney, 105 Mont. 523, 74 P.2d 450; Bode v. Rollwitz, 60 Mont. 481, 199 P. 688; McClure v. Couch, 182 Tenn. 563, 188 S.W.2d 550; Irvin v. Crammond, 58 Ind.App. 540, 108 N.E. 539; Western Pac. Ry. Co. v. Southern Pac. Co., 9 Cir., 151 F. 376; Katz v. Patterson, 135 Or. 449, 296 P. 54; Freytag v. Vitas, 213 Or. 462, 326 P.2d 110; Kansas City Fibre Box Co. v. F. Burkart Mfg. Co., 184 Ark. 704, 44 S.W.2d 325; Perks v. McCracken, 169 Ky. 590, 184 S.W. 891; 56 Am.Jur., Waters § 476. See also Freeland v. Pennsylvania R. Co., 197 Pa. 529, 47 A. 745, 747, 58 L.R. A. 206, where it was said that "'alluvion' has been defined to be those accumulations of sand, earth, and loose stones or gravel brought down by rivers, which, when spread out to any extent, form what is called 'alluvial land,'" and where it was also held that a riparian owner could recover for the loss of sand previously deposited between the high and low water mark by reason of the wrongful act of another. What plaintiffs contend to have been the nucleus of Austin Island is clearly shown by their exhibit 51 to have been either an accretion to defendant's land in that there was no intervening land below the low water mark, or to have been attached and contiguous to the land to the north and east, and, therefore, not an island.

Ice then presented a tracing, exhibit 54, which he made from a part of a map, exhibit 55, prepared by the Mississippi River Commission and dated November 1902. That map is the same as defendant's exhibit QQ. The New Madrid water gauge is not shown, but by a detailed computation in their brief plaintiffs reach the conclusion that the gauge was 9.2 feet. On this tracing Ice drew in Austin Island with a dotted line and we have reproduced a portion of this tracing and appended it hereto.[3] The location of the willows are shown at about

the same place as on exhibit 51, but the high area immediately east of the Austin Island area has been completely washed away. The water in the chute at the east of Austin Island is the precise place where in 1885 the elevation was shown to be between 15 and 20 feet above the water level when the New Madrid gauge was 10 feet above the low water mark. The area of a chute north of Austin Island where in 1902 water is shown to be, in 1885 was an area of accretions to defendant's land. The area where plaintiffs contend Williams chute existed in 1915 is shown to constitute land or a bar approximately 15 feet above water level. It is obvious from a comparison of the conditions revealed by the map of 1885 and the map of 1902 that in the intervening period the river made some rather violent and decisive changes at this area, and it is also apparent that it continued to deposit alluvion to the shore line of defendant so that by 1902 it included all of Austin Island except the southern tip.

In 1899 the Mississippi River Commission engineers constructed a dike, shown on exhibit 55, a little more than a mile west of the west tip of Austin Island to close what was called a "deep chute, with a well defined channel," which undoubtedly was the chute shown on exhibit 54 running north of Austin Island. This channel was deeper than the main channel of the river, and during low water the river water would run through it instead of the main channel where it was needed for navigation. The efforts of the engineers were successful, and by 1902 the upper part of the channel or chute was closed at low water as is shown on exhibit 54. By a series of lengthy computations in their brief plaintiffs attempt to show that in 1902 water flowed around the area described as Austin Island and Williams Island at a slightly higher stage than that shown on exhibit 54 (9.2 feet), and that prior thereto water had flowed around the area when the New Madrid gauge was 2.2 feet. However, in

3. See 341 S.W.2d 94.

determining whether this area originated as an island the facts shown on exhibit 54 must be considered in connection with the previously existing conditions as shown by exhibits 51 and 53.

Exhibit 51 clearly shows that accretions had formed to defendant's land so as to extend it further south than the subsequently formed chute running north of Austin Island as shown on exhibit 54, and it is also clearly shown that those accretions included a substantial part of the area referred to as Austin Island. On exhibit 51 no high bank or high bank chute is shown. Therefore, it is obvious that subsequent to 1885 the right bank of the river was not moved northward by erosion to the area of the high bank chute, but that the bank continued to move southward by reason of accretions, and subsequent to 1885 and prior to 1899 the high water of the river scoured out a secondary channel by cutting in behind some of the accreted land of defendant and left the partially formed area of Austin Island and Williams Island as one piece of land still identifiable and intact at the low water mark, and even at higher water, bounded on the south by the main channel of the Mississippi River, and bounded on the north by the deep channel referred to in the government reports. In this process of cutting or scouring out the new but secondary channel, the river cut through the highest part of the peninsula immediately to the east of the clump of willows which plantiffs contend was the nucleus of Austin Island, and in its cutting and scouring action it formed the high bank, the high bank chute, and Austin chute on and through the accreted land of defendant where they had not existed in 1885. It also appears that subsequent to 1902 water continued to flow in these chutes when the water level was considerably above the low water mark, and that at some time subsequent to 1902 and prior to 1915 the high water cut across the area and scoured out what is referred to as Williams chute. When we consider the conditions revealed by the map of 1885, the construction of the dike in 1899 and the reason therefor, and the conditions revealed by the map of 1902, we necessarily conclude that while the area shown on the 1902 map to constitute a part of Austin Island may have been an island in the sense that it was or sometime had been surrounded by water, it was originally formed by the river cutting in behind land to which defendant had title, and it was not an island formed in that part of the bed of the river to which the State of Missouri had retained title.

In addition to the maps of 1911–15 (exhibit 58) and of 1929–30 (exhibit 61) which we have already discussed, plaintiffs presented two aerial photographs, exhibit 80 made in 1941 when the New Madrid gauge was 6.1 feet, and exhibit 81 made in 1951 when the New Madrid gauge was 14 feet. The tree formation and the shadows clearly reveal the high bank, the high bank chute and Williams chute, and possibly it can be said that the northern portion of what plaintiffs contend is Austin chute is shown. But we disagree with plaintiffs' statement in their brief that exhibit 81 shows water around Austin Island, although there is some water shown in the chute north of Williams Island. These exhibits, while showing certain conditions at the stated times, do not affect our conclusion concerning the original formation of the area known as Austin Island.

■ When we consider and weigh all the evidence, we necessarily reach the conclusion that the area of Austin Island did not originally form in the Mississippi River from that part of the bed to which the State of Missouri had retained title, and title to the area never vested in New Madrid County, or in any county, by reason of Sections 241.290 or 241.300. Therefore, the patent, dated June 22, 1915, did not convey any interest in the land to plaintiffs' predecessors in title, and plaintiffs have no interest in the land by reason thereof.

In our previous discussion we have assumed throughout that Austin Island is in

New Madrid County. The conclusion we have reached makes it unnecessary to determine in this proceeding whether Austin Island is situated in New Madrid County or Pemiscot County.

This brings us to the issue of whether title to Austin Island and its accretions is vested in plaintiffs by reason of adverse possession. Plaintiffs' position, as stated in their brief, is that their predecessors in title "took possession under the patent, * * * by having the area patrolled and cruised by timber men for the purpose of protecting the growing timber, by painting and maintaining a red line around the area, by removing the only merchantable timber, in 1932–33 * * * and [they] were the only persons to pay the taxes assessed against the tract."

In 1924 Mr. Kimes transferred his one-half interest in Austin Island to Dillman Egg Case Company, also known as Dillman Industries, which in 1942 transferred its interest to Hobac Veneer & Lumber Company, hereafter referred to as "Dillman" and "Hobac" respectively. There is no evidence of any act of possession on the part of those claiming under the patent until Dillman caused the timber to be cut off in 1932 and 1933 and sent "half the stumpage to W. V. Conran." After 1933 no timber was cut by Dillman, or by plaintiffs or any of their predecessors in title, and according to Jim Ahern who was then manager of Dillman, the only thing that was done thereafter was that "our men cruised and visited it" periodically. The term "cruise" was defined as "estimating" the amount of lumber that could be obtained from growing trees. Mr. N. J. Boyd testified that he did the cruising and buying for Dillman from "the early thirties" until Mr. Lemieux was hired in 1942, and in that time he saw Austin Island "two or three times probably" and one time Mr. Dillman had him "make a cruise," but he did not "make a close cruise." Mr. Lemieux worked for Dillman and Hobac until 1953, and in his testimony he made no reference to "cruising" Austin Island, but he said

that after Hobac purchased it "I was sent in there" with Mr. Nave, who "didn't work for any body" and who "kinda pointed out the line." Mr. Kenneth Hall, a timber estimator and buyer for Hobac, first "went up to cruise this timber" in 1943, and he thereafter saw Austin Island "about once a year, sometimes two years before I seen it," and he "didn't cruise it at any time only just this one time." This is the only evidence we find to the effect the area was "patrolled and cruised."

Neither Dillman nor Hobac, and none of the plaintiffs, ever placed any buildings or fences on the land, and they made no use of the land such as grazing it.

Kenneth Hall testified that he had been familiar with Austin Island for about eight years, or since 1947, and that he "looked after the timber there and kept the lines kinda painted up" for Hobac. The testimony concerning painted lines apparently refers to paint placed on trees in the same manner in which a tree might be blazed. Hall testified that "several years ago we found some red paint around that chute between Austin Island and the high bank," and that at some indefinite time he "found a red line along the high bank, an old red line." There is no evidence as to who painted these old lines or when. In 1948, after a survey by Hobac, Mr. Lemieux placed a "well painted red line all the way around on the east side [of Austin Island] to the river," and he observed a "blue line on the west side" which had been placed there "between two and three years ago" by Anderson-Tulley Company. There were also five different blazed lines through the woods, "crossing and criss-crossing, going in different directions."

Defendant maintained a fence on the west side of Austin Island and its accretions. He had no fence on the east side of the property, but he did maintain a fence with permission farther east on the Hunter-Conran property. He testified that he did not claim to that east fence, but he grazed his stock between the fences and

sometimes charged others to graze their stock in the area.

The trial judge found that the defendant "on one occasion had obtained permission [apparently from some of the plaintiffs] to use it [Austin Island] for pasture land." We find no support in the record for this finding. Defendant rented all or some of the *adjacent* Hunter-Conran land for several years, and he had permission to use that land for pasture. Plaintiffs assert that "the defendant admits that he used *the area* for pasture, for which he had always had specific permission." If by the reference to "the area" plaintiffs meant Austin Island, the page references in their brief do not support this assertion.

In connection with the payment of taxes, we find that Dillman and Hobac paid taxes on 19.04 acres in Section 16 and 17.06 acres in Section 17 from 1929 through 1941 except for the years 1934 and 1935. Thereafter they paid taxes on only the 17.06 acres in Section 17 until in 1954, after this controversy arose, when they paid the taxes on "Austin Island and accretions." In 1921 and 1922, and for 1926 through 1933 defendant was assessed for 852 acres of accretions in Sections 16 and 17. Plaintiffs contend that a "tax compromise" was made by defendant in 1933 whereby he "abandoned his claim to all bottom land, insofar as taxes were concerned." It is apparent that some change was made in 1933, and although it is not clear just what it was or the reason therefor, defendant thereafter was assessed for 347 acres "accretion" in Section 17, and the assessed valuation on accretion land was increased from $1,800 to $9,900. We note that in view of the acreage in Section 17 of mainland owned by defendant, 347 acres of "accretions" would necessarily have to include substantial portions of Austin Island. The tax records of defendant subsequent to 1942 are not in the record, and it is not clear what taxes, if any, he thereafter paid.

 The party asserting title by adverse possession has the burden of estab-

lishing each and every element to establish such title. Horton v. Gentry, 357 Mo. 694, 210 S.W.2d 72, 75. The necessary elements are "(1) the possession must be hostile, that is, under a claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous." Krumm v. Streiler, Mo.Sup., 313 S.W.2d 680, 686; Shore v. Baumbach, Mo.Sup., 310 S.W.2d 901, 904; Grimes v. Armstrong, Mo.Sup., 304 S.W.2d 793, 799. "Whenever any of these elements is lacking, no title by adverse possession can ripen." Brown v. Chapman, Mo.Sup., 163 S.W.2d 920, 922, 923. After a careful and thorough study of the record we conclude that there is insufficient evidence to show actual, open and continuous possession on the part of plaintiffs and their predecessors in title of any part of the land claimed by plaintiffs. We shall briefly set forth our reasons.

 This was "wild" land in that it was not suitable for cultivation, and "There can be no adverse possession of wild land without actual possession." 2 C.J.S. Adverse Possession § 38g. There is no evidence of any acts of possession until 1932 when Dillman cut the timber off the land. But an isolated act of cutting timber on wild land does not constitute such actual possession to vest title by adverse possession. Horton v. Gentry, 357 Mo. 694, 210 S.W.2d 72, 75; 2 C.J.S. Adverse Possession § 31. The acts of "cruising" shown by the evidence did not constitute evidence of possession, and hardly implied a claim of ownership. There is no evidence of the painting of lines prior to 1948, except the vague references that some old lines were found without any showing of who painted them or when. In any event, while the painting of these lines may have evidenced a claim of ownership they did not evidence actual, open and notorious, exclusive and continuous possession. Plaintiffs, or their predecessors, paid taxes on only a small fraction of the area of Austin Island. Defendant paid taxes on an indefinite area which had to include some of Austin Island until 1942, and it is not clear what he did thereafter.

However, in any event, while the payment of taxes is evidence of a claim of ownership, Woodside v. Durham, 317 Mo. 15, 295 S.W. 772, 53 A.L.R. 884, it does not alone constitute evidence of possession. Crider v. Meatte, 320 Mo. 474, 7 S.W.2d 691; Brown v. Evans, Mo.Sup., 182 S.W.2d 580; Pharis v. Jones, 122 Mo. 125, 26 S.W. 1032; McVey v. Carr, 159 Mo. 648, 60 S.W. 1034. The mere payment of taxes does not create title, and likewise the mere nonpayment of taxes does not divest title. Himmelberger-Harrison Lumber Co. v. Craig, 248 Mo. 319, 154 S.W. 73, 77. In addition, the payment of taxes and isolated instances of cutting timber together, under circumstances similar to those here, while admittedly evidence a claim of ownership, have been held not sufficient to establish title by adverse possession. Horton v. Gentry, supra; Federal Gas, Oil & Coal Co. v. Harmon, 254 Ky. 255, 71 S.W.2d 630; Fitzgerald v. Aldridge, 201 Ky. 846, 258 S.W. 665; 2 C.J.S. Adverse Possession §§ 31, 38 and 221b(2). Section 516.040 RSMo 1949, V. A.M.S., provides that possession, under color of title (the patent from New Madrid County constituted color of title) of a part of a tract of land, in the name of the whole tract claimed, and the exercise during the time of such possession of the usual acts of ownership over the whole tract so claimed, shall be deemed a possession of such tract. This statute does not aid plaintiffs because the evidence establishes that neither they nor their predecessors in title were in actual possession of any part of Austin Island or its accretions. See also Fiorella v. Jones, Mo.Sup., 259 S.W. 782, on the requirement that the possession be exclusive, at least as to actual owner, and Stone v. Perkins, 217 Mo. 586, 117 S.W. 717, on the requirement of continuous possession.

We conclude, from our own examination of the record, that the finding of the trial judge who heard the case that plaintiffs, and their predecessors in title, have had "open, notorious, adverse and continuous possession of said land" for the prescribed period to vest title by adverse possession is clearly erroneous. We do not rule whether the acts of possession on the part of defendant would be sufficient to vest title in him by adverse possession, because we have previously found and concluded that the land from which he cut timber was an accretion to his mainland and not the property of plaintiffs.

The after-trial motions filed by defendant included a motion to set aside the judgment of the trial court and to enter judgment in favor of defendant which was filed with the motion for new trial. On appeal this court is authorized to "reverse or affirm the judgment or order of the trial court, or give such judgment as such court ought to have given, as to the appellate court shall seem agreeable to law." Section 512.160. From our review of the entire transcript we are of the opinion that the judgment entered below in favor of plaintiffs was not supported by the evidence, and for the reasons previously set out we also are of the opinion that the trial judge, in ruling on the after-trial motions, should not have granted a new trial but should have set aside the judgment in favor of plaintiffs and entered judgment in favor of defendant. Therefore, as we are admonished by the statute to do in situations such as this, we shall on this appeal dispose finally of the issues.

The order granting a new trial is set aside and the cause is remanded to the trial court with directions to enter judgment in favor of defendant on plaintiffs' petition, and in favor of defendant on his counterclaim (denominated a cross-claim) to declare the patent from New Madrid County to M. J. Conran and D. C. Kimes to be void and of no effect.

STEELS SURVEYS
Austin and Williams Is.
And
WILLIAMS ISLAND
Patent Description

PART OF EXHIBIT 51

Showing Steel's May 14, 1915 survey of Astry Is.

Scale- 8" = 1 Mile

PART OF EXHIBIT 54

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court En Banc.

HYDE, C. J., and WESTHUES, EAGER, DALTON and HOLLINGSWORTH, JJ., concur.

STORCKMAN, J., dissents in separate opinion.

LEEDY, J., dissents and concurs in opinion of STORCKMAN, J.

STORCKMAN, Judge (dissenting).

The trial of this case before Judge Randolph H. Weber without a jury began on April 21, 1955. There were 14 sessions and 38 witnesses were heard orally. The last session was on January 7, 1956, almost nine months after the hearings started. The testimony was then transcribed and the issues were briefed by the parties. The last brief was filed October 13, 1956, almost ten months after the trial was concluded. The decision in favor of the plaintiffs was rendered on March 21, 1957, which was about five months after the final submission of the case. Judge Weber then resigned to accept an appointment as United States District Judge.

Judge Weber found that there was an island offshore at the time of the patent; that the plaintiffs were owners by virtue of their patent and also that they had been in adverse and continuous possession since 1922 and would be entitled to the land by adverse possession.

Judge Philip S. Terry was appointed on March 30, 1957, in the place of Judge Weber who resigned about a week earlier. On June 13, 1957, the defendant's motion for a new trial was argued before Judge Terry. About a week later, on June 21, 1957, Judge Terry sustained the motion for new trial on the ground that the judgment was against the weight of the evidence. The only finding on which there was a specification of error was with respect to the boundary line of New Madrid County.

The majority opinion reaches a conclusion different from that arrived at by either of the circuit judges in that it remands the cause to the trial court with directions to enter judgment in favor of the defendant on plaintiffs' petition and in favor of defendant on his counterclaim and to declare the patent from New Madrid County void and of no effect.

I regret that I cannot agree with the result reached in the majority opinion nor its rationale. Among the reasons I believe the opinion is erroneous are these:

1. *The patent issued by New Madrid County in 1915 to plaintiffs' predecessors in title is sufficient evidence to establish that the county had title to the land at the time of the conveyance and if not overcome by defendant's evidence is sufficient proof to support the judgment rendered by Judge Weber.*

Section 241.310 RSMo 1949, V.A.M.S., provides that all counties in which the islands and abandoned river beds described in § 241.290 and § 241.300 are situated shall have the power to have them surveyed and "to sell and convey them in the same manner that the swamp lands acquired under the act of congress of September 28, 1850," are conveyed. Sections 241.010 through 241.280 deal with these swamp and overflow lands and how they shall be conveyed. Frank v. Goddin, 193 Mo. 390, 91 S.W. 1057, 1058, holds that islands formed in navigable streams belong to the respective counties in which they appear and are subject to disposition as swamp lands for the benefit of the public schools.

Section 241.220 provides that when swamp lands are fully paid for, the county court shall issue a patent to the purchaser and § 241.120 provides that all patents issued, executed and duly recorded as required by §§ 241.010 through 241.280, which

includes the patents issued pursuant to § 241.220, "shall be received and read in all courts in this state *as prima facie evidence of the title in the counties* where such overflowed and swamp lands severally lie." Emphasis added.

Thus the patent in question is "prima facie evidence that the title" of the land was in New Madrid County. In Hatch v. Rhyne, Mo., 253 S.W.2d 170, the plaintiffs claimed title to an island in the Mississippi River by reason of a county patent and subsequent deeds. Among other things the defendants attacked the validity of the patent. This court stated that the plaintiffs "made a prima facie case when they showed legal title in them under the patent" and the subsequent conveyances but that the defendants were entitled to prove that "the patent under which plaintiffs claimed was void on its face, or show by extrinsic evidence that the county did not have title to the land it conveyed." 253 S.W.2d 172–173. In Morgan v. Stoddard, 187 Mo. 323, 86 S.W. 133, 135, the patent was held to be prima facie evidence of title in the county to swamp lands, although its effect was overcome by an admission that the lands did not lie in the county which undertook to convey them. Thus by statute the patent is not only evidence of the conveyance, *but also is prima facie evidence that New Madrid County was the owner of the land it undertook to convey.*

The term prima facie evidence has been frequently defined. In Missouri District Telephone Co. v. Southwestern Bell Telephone Co., 338 Mo. 692, 93 S.W.2d 19, 23 [9], prima facie evidence was said to be such evidence as in the judgment of the law is sufficient to establish the fact and if not rebutted remains sufficient for that purpose. See also State ex rel. Donnell v. Osburn, 347 Mo. 469, 147 S.W.2d 1065, 1068[8], 136 A.L.R. 667, and Kirkwood Realty, Ins. & Adjustment Co. v. Henry, 349 Mo. 522, 162 S.W.2d 600, 603[7].

The majority opinion states that "the fact that the county had the land surveyed and then issued a patent therefor on the basis that it was an island to which it had title * * * is entitled to substantial weight, it is not conclusive on the issue of whether there was then or ever had been such an island." Under the statute the patent is conclusive evidence of ownership unless its force and effect, provided by law, is overcome by proof that title was not in the county when the patent was issued. The majority opinion does not refer to the statute nor consider its force and effect. In fact, except for the reference above noted, the opinion does not discuss the importance of the patent as evidence; it seems to proceed upon the theory that the burden was upon the plaintiffs to prove their title by other evidence.

The patent describes the land it purported to convey and further characterized it "all known as Austin Island." It was issued in 1915, recorded promptly and remained unchallenged for almost 40 years. There is no charge of fraud or wrongdoing in obtaining the patent. The wisdom of the statute making the patent proof of title is demonstrated by this case in which more than 40 years elapsed since the occurrence of the events about which the witnesses are called on to testify. Unless rebutted, the patent alone is sufficient evidence to justify Judge Weber's judgment and it should not be held "clearly erroneous."

*2. In addition to the patent, there is sufficient evidence from which the trial court could reasonably find that there was an offshore island known as Austin Island to which New Madrid County acquired title at some time prior to the issuance of the patent in 1915.*

Originally the defendant's brief referred to the land in question as a "mythical island" and denied there was ever an Austin Island or any island at the place in question. Nevertheless, at the second argument in division and during the argument before the court en banc defendant's counsel, under questioning by a member of the court,

conceded that there had been a high bank chute through which water flowed separating the land in controversy, or at least a portion of it, from the Girvin land. The theory of defendant's counsel as expounded in oral argument was that the tract in question was originally an accretion to defendant's land, and that the channel or high bank chute was caused by avulsion thereby continuing the title to the land thus separated in the original owner. On the other hand, the plaintiffs claim that all sand bars and other accretions were washed away entirely and that the island formed as a towhead in the river independently of the defendant's land. Apparently both parties now agree that a high bank chute existed which is now largely filled in although a high bank still remains. An aerial photograph is said to show the high bank although there is controversy as to whether there was any water in the chute. Therefore, as a result of two rehearings, it appears that the issue has been narrowed to whether the land in question originated and grew from a towhead in the river or as an accretion to defendant's land separated at some time by avulsion then reunited by further alluvial deposits. Thus the parties agree that the area in question is made land in that it was created by alluvial deposits from the waters of the river.

We have read the testimony of witnesses said to be controlling on the manner of formation of the land. The testimony is lengthy and cannot be set out in its entirety, but we will refer to some of it and particularly that which relates to the existence or non-existence of an Austin Island or Towhead prior to 1915 and within the period designated by § 241.290 and § 241.300 when title would vest in the adjoining county.

John Grimes, a witness on behalf of the plaintiffs, was 78 years old at the time of the trial in April 1955 and had lived at Stewart in Pemiscot County all of his life. He first became acquainted with the Mississippi River when he was about 8 or 10 years old. (93)[1] When he first came to know this part of the river, there wasn't any Austin Island. It was all river. (134) There were no offshore islands between the ferry and Stewart's landing. (94) He was acquainted with Bill Austin in his lifetime. (93) The first time that he noticed an island or a group of towheads developing out of the Mississippi south of the ferry road down to Stewart's landing was about 1914 or 1915, but he stated that he was "a very poor hand to dates." (95) At the time he first saw the island, there couldn't have been but two or three acres. Mr. Austin lived on the island for two or three years and had a garden and a truck patch. Because he lived there, it was called Austin Island. Williams Island was located below Austin Island and there was a body of water between them. (97) The witness farmed, fished and hunted most of his life. At that time there was water between Austin Island and the high bank. He trapped in the high bank chute. (98) There was a "pretty good little body of water at the time" that he trapped there. That was along about 1914 and 1915. On the east of Austin Island towards the river there was mostly water. (99) From the old river chute or the old high bank, the chute went about three quarters of a mile east and turned out to the river and "another slough directed it down to the river." He trapped some in that slough. The Williams Chute is the one between Williams Island and Austin Island. It is the lower one. (100) Where Mr. Austin "truck patched there was only two or three acres and the rest of it was river at that time." Now it is land and grows timber. The chutes that he told the court about are there only in high water, in low water they dry up. (101)

On cross-examination the witness testified that it was only during high water that the island was surrounded by water. (107) What the witness called Austin Towhead was in there at the mouth of Williams Chute and a short distance from there Mr.

1. Numerals in parentheses refer to pages of the transcript of the record on appeal.

Austin had his shanty built. (111) The Austin Towhead was separated from Williams Island by a little chute or a slough. (112) The witness again said that as far as I could recollect it was 1914 or 1915. By 1916 or 1917 it was a little bit larger but he didn't remember how much larger. (113) While the witness stated that the Austin Towhead had water on two sides (114), he further testified that on the lower end it ran down and almost connected with Williams Island and on the west side a slough came around. (115)

On redirect examination the witness testified that he did not testify on cross-examination that there was a little finger of land that ran out into the river north of the ferry that was known as a towhead. (116) He further testified that there was water around the Austin Towhead at that time and that he did not know anything about a little finger of land coming out into the river. (116) As the years went by, during low stages of the water, the chute that had had water around Austin Towhead went dry. (117) South of the island was water and sand and mud with little bits of sprouts of something just starting. On the north next to the high bank there was water, a slough of water was in there. On the west, the side furthest away from the river, there was "what you would call a ridge and water." (124) At this point the witness appeared to be having difficulty expressing himself and this occurred: "A. If you would go with me, I would take you and show you what I mean. The Court: What we are trying to get you to do is give us a word picture because we can't go out there and look at it. A. I am going to try to do it the best I can." (126) (Some of the questions of counsel as recorded in the transcript are as confused and as difficult to understand as the witnesses' answers. For example, see p. 127.) John L. Girvin's Chute which runs east and west comes down from the high bank and runs for about two miles before it turned east and went back into the river. The west end came out with Williams

Chute. (128) Austin Island was right between the two sloughs. (129) What the witness called Austin Island and Austin Towhead were the same thing. (131) The year when he couldn't trap, it was because the water dried up, there was low water. (132) The witness volunteered to demonstrate with a drawing which was marked as Exhibit 17 and put into evidence, but it adds little if anything to his testimony. Without his explanation, the exhibit is not understandable and much of the examination, both questions and answers, was conducted by pointing, which means nothing to the reader of the written transcript although it doubtless had some significance to those who observed it.

Mrs. Ora Peppers, 76 years of age, presently living in Portageville and a witness for the defendant, came into the Girvin household with her parents when she was three years old. Her first recollection of the lay of the land was when she was about 11 years old. On direct examination she testified about a fence on the property and the location of the landmarks and stated that she had hunted cows and hogs and picked berries "from one end of that bar to the other and never seen a island in there." (1186) On cross-examination she was asked about the old river chute and volunteered this information: "No, I went to that towhead, Austin Towhead, went straight through to Austin Towhead which is below" (1194) that line and there was a chute between the Austin Towhead and the bank. She was too small to remember how wide the chute was. (1194) The chute ran two or maybe three miles below the ferry. The water came about half way up the chute but steamboats couldn't get up in that chute. They had to go around east of that chute up to Tiptonville. In 1897 the water came to the top of that chute and her husband cut paper wood right there and they would go in swimming in that chute of the evening when they would come in from work. (1195) The Austin Towhead got its name because old man Austin landed there and came there. She

remembered about the boat catching fire and sinking on the upper end of the Towhead. She did not remember how much higher Austin Towhead was than the balance of the bar but she knew it was called the Austin Towhead and she was on it. She never heard the place called an island, it was just called Austin Towhead. (1197) The place where her husband was cutting timber in 1897 was just above the Austin Towhead. When the men came in for their night's lodging they would go in to take a bath, a swim. Their camp was not on the Towhead but on the land above it and they swam in the chute between the land and the Towhead. (1198) That was in August 1897. The water stayed there the year around then but not since then. At that point there was a bank slanting down to the water but it wasn't steep. (1199) Mrs. Peppers was recalled and testified that the chute where they camped did not connect up with the river. (1268) But again she testified on cross-examination that the water stayed in the chute all the time, it was river water and went right around the Towhead, but that the Towhead was attached up there to the ferry landing. (1270)

John Clarahan, age 79, testified by deposition for the defendant that he came to the New Madrid-Pemiscot area in September 1895. He was building levees in that vicinity and became familiar with the Girvin land. There was a body of land south of the Girvin line which was referred to as Austin Island. It was right above Stewart's landing. (1234) The land that was called Austin Island was located about a mile above Stewart's landing. He was never on the island and did not know anything about it.

S. L. Hunter, age 75, a landowner in the area, testified on behalf of the plaintiffs that in 1907 he saw the island called Austin Island when he was at that place in connection with a survey. It was small and had willows on it. It was completely surrounded by water. There was water between it and the main shore. It looked as

if there might be a hundred acres on the island. (1803) It was cone shaped. (1804) He estimated that there was about 1,200 to 1,500 feet of open water between the island and the bank. (1805) It was in 1907 that the survey was run; he stood on the bank and saw the island. Steamboats went between that island and the Missouri shore for more than a year. It was the island that "they called the Austin Island." (1964)

All of these witnesses agree that a body of land existed which was known as Austin Island or Austin Towhead. They vary as to time and dates and some of them as to whether it was connected with the mainland and, if so, to what extent. But I do not consider these differences sufficient grounds for this court to reject the testimony. We have seen records in this court where testimony given 40 *days* after a casualty that was less clear and more conflicting. So far as I know we have never held that the trial judge or jury was not justified in basing a finding on it. Moreover, so far as I could discover, the testimony of S. L. Hunter was clear and unimpeached.

Even defendant's witnesses referred to the area as a towhead. While witnesses may use the same word with a different meaning, absent an explanation, the dictionary definition of the word towhead is important. A towhead is defined as: "A low alluvial island or shoal in a river; esp., such an island with clusters of cottonwood or the like. *Local, U.S.*" A shoal is: "A sand bank or bar which makes the water shoal [shallow]." Alluvial means: "Pertaining to or composed of alluvium". The latter in turn is: "Soil, sand, gravel, or similar detrital material deposited by running water, esp. during recent geologic time." Webster's New International Dictionary, 2d Ed. This definition supports the plaintiffs' theory.

The testimony referred to is consistent with the prima facie evidence of title in New Madrid County based on the patent. Additionally Judge Weber could reason-

ably find support in it for the judgment that he rendered.

3. *The maps upon which the majority opinion depends are not conclusive and their probative value is for the court to determine in connection with related testimony given by the witnesses.*

In a similar case this court stated in Dunlap v. Hartman, Mo., 338 S.W.2d 10, 13: "Whether the point of contact of the accretions 'was the railroad right of way or the slough, *even the interpretation of the photographs and plats,* depends on whether one believes and accepts the testimony offered by the plaintiffs or that offered by the defendants." Italics added. See also Hamburg Realty Co. v. Woods, Mo., 327 S.W.2d 138, 153, and 32 C.J.S. Evidence § 767a, p. 688, and § 730b, p. 638.

In seeking to show that the land did not originate and exist as an island, the majority opinion relies almost wholly on several river maps and the computation of the water stages in the vicinity of Austin Island by comparison with the gauge at New Madrid about 21 miles away. I am not convinced that these maps prove that the land in question could not and did not originate as an offshore island. For an interpretation of these maps, the court must depend upon witnesses having some special skill; the credibility of these witnesses, like others, is a matter primarily for the trial court. The vagaries of the Mississippi River, even from year to year, are well known. I do not think this court has the expertise to employ these several maps to destroy the effect of testimony which the trial court apparently chose to believe. Nor can these maps discount entirely the prima facie case made by the patent which was prepared and ordered delivered by county officials who were in a better position in 1915 to know the truth about the origin of the land in question than witnesses called to the stand 40 years later to give their recollections or to demonstrate by the use of maps that Austin Island did or did not exist. It is said that it can be

scientifically demonstrated that a bumble bee because of its body size and limited wing span cannot fly but we know that it can. In my opinion, the patent issued in 1915 is superior evidence to a map prepared at another time for other purposes. Many witnesses testified that there was an Austin towhead or an Austin Island and sufficiently described its character so that the trial court could reasonably find the island offshore in origin.

4. *The opinion recognizes the rule of deference to the trial court's judgment but does not apply it.*

In the recent case of Schlanger v. Simon, Mo., 339 S.W.2d 825, 828, the author of the majority opinion thus stated the rule of deference and scope of review in a court-tried case: "On an appeal in an equity case, such as this, the appellate court reviews the whole record, determines the weight and value of the evidence, and reaches its own conclusions as to the facts, giving due deference to the findings of the chancellor who saw the witnesses and heard their testimony. Botto v. James, Mo.Sup., 209 S.W. 2d 256; Mueller v. Mueller, Mo.Sup., 318 S.W.2d 365. But the appellate court performs the above functions only in respect to the specific matters urged by appellant as constituting error. It does not review the whole case on its own initiative to determine what result it would have reached if it were sitting as the trial judge."

The trial of this case was before an able and experienced trial judge. The record shows some of the testimony was accompanied by reference and pointing which may have been helpful to the trial judge that saw it, but means nothing on appeal. The judgment should not be reversed *unless clearly erroneous.* Section 510.310, subd. 4 RSMo 1949, V.A.M.S. In reaching its conclusion in Hamburg Realty Co. v. Woods, Mo., 327 S.W.2d 138, 153–154, a similar case, this court stated: "The trial judge had before him the maps, deeds and other exhibits and saw the witnesses, and thereby was more able to judge of their credi-

bility and interest, if any, and to evaluate the conflicting interpretations placed upon the maps, deeds and other facts concerning which the witnesses testified than is the reviewing court." This statement seems particularly appropriate for application in the present case.

The majority opinion also disregards the rule that a court may believe a part of a witness' testimony and reject the remainder. Huffman v. Mercer, Mo., 295 S.W.2d 27, 32; Burr v. Singh, 362 Mo. 692, 243 S.W.2d 295, 298. Instead of observing these rules, the majority opinion views the evidence of the plaintiffs with a jaundiced eye and seeks to destroy it entirely. This is the antithesis of the approach enjoined on us by § 510.310, subd. 4 and our rules and decisions. For example, the opinion throws out entirely the testimony of witness Grimes. The central fact in his testimony was that when he first saw Austin Island it consisted of 2 or 3 acres and Mr. Austin was living on it. The witness stated that this was about 1915 but he warned the court and parties that he was not too good on dates. The trial court might very well have believed that Grimes did see the island when it consisted of 2 or 3 acres, but that he was mistaken as to the date and that he had first seen it at an earlier time. His testimony permitted this inference. The trial court might reasonably have been influenced by this in conjunction with the patent and other evidence to hold that the land originated as an offshore island. But this and other evidence the majority opinion rejects completely.

Time and space does not permit a demonstration of the result that could be achieved by an application of the rule of deference to the testimony of the witness above referred to as well as others, some of whom were called by the defendant. Because of time limitation, I have been able to read only a portion of the 2,380-page transcript, but the sampling that I have done convinces me that I cannot agree with the majority opinion in the respects indicated. I

have not treated adverse possession, the location of the county line and some other matters raised in the brief because it is obvious that it would be unrewarding to do so. Subject to a favorable determination on these other matters, I would reverse the judgment and remand the cause with directions to reinstate the judgment rendered by Judge Weber.

5. *Even if re-entry of the judgment is not justified, the opinion appears gratuitous in that it sets aside the order of Judge Terry granting a new trial, directs the entry of judgment in favor of the defendant on his counterclaim as well as on plaintiffs' petition and declares the 1915 patent void even though the defendant did not appeal from the judgments of the two trial judges denying his affirmative relief.*

Plaintiffs' first amended petition asserted a cause of action for wrongful cutting of timber and asked for treble damages. The defendant filed an answer denying plaintiffs' claim and setting up a "cross-claim and affirmative defense". The cross-claim prayed a cancellation of the plaintiffs' patent; the affirmative defense pleaded title by adverse possession specifically and also generally asserted a superior record title. The reply denied the defendant's affirmative assertions and claimed title by limitation if the court should find any defect in the patent. The reply prayed for judgment in accordance with the prayer of the amended petition and for an adjudication of title "in the event the court considers the count or claim to quiet title as injected" (29) by the defendant's answer.

One of the plaintiffs, Effie M. Conran, claimant to a one-half interest in the land, died after the institution of the action and the cause of action as to her was revived in the name of her administrator. As to this, the defendant states, Respondent's Brief, pp. 4–5: "This case was properly revived in the name of J. V. Conran, administrator of the estate of Effie M. Conran, if title to real estate was not involved, except as it might be *indirectly* involved to de-

cide the issues in the case; but if the action be one as apparently contended for by plaintiffs (and so found by Judge Weber), that title to real estate was *directly* involved, then the revival of the case in the name of the administrator of the estate of Effie M. Conran was improper; because in such case, the cause of action would have to have been revived in the name of the heirs of Effie M. Conran and also the grantees of Effie M. Conran who conveyed her interest in the real estate during the progress of the trial, to Mary Susan Conran and Salley N. Conran, Tr. 58, 59." In the first paragraph of the "Conclusion" of his brief, the defendant contends, p. 131: "That title to the real estate was not directly involved, title to real estate being only indirectly involved in order to determine the issues made by the pleadings, and that Judge Weber erred and exceeded his jurisdiction in rendering judgment in favor of Appellants and against Respondent on the question of title to the real estate." The defendant also pressed this point in oral argument.

If it would be improper to quiet title in favor of the plaintiffs on this record as the defendant contends, then it would be equally erroneous to quiet title in favor of the defendant as the majority opinion does. All persons materially interested in the subject matter of a suit to quiet title should be made parties to it so that there may be a complete decree which will bind all of them. This court so held in Buford v. Lucy, Mo., 328 S.W.2d 14, 19[7], and reversed and remanded the case so that other necessary parties might be brought in.

But our main contention under this heading is that under established practice, the scope of this review is to determine whether Judge Terry erred in granting a new trial. The plaintiffs' position was that the court did err because the judgment in plaintiffs' favor was justified and it should be reinstated even if in a modified or amended form. Plaintiffs' request that this court finally determine the case should be construed within the scope of proper appellate

review. It seems anomalous and rather harsh to interpret this request as an invitation by the plaintiffs to give their opponent a free ride, so to speak. The opinion grants relief to the defendant which he did not seek on this appeal and to which he was not entitled absent an appeal. Thus he is spared the burden that goes with being an appellant. We believe the record bears this out.

The defendant's after-trial motion prayed that plaintiffs' judgment be set aside and that a new judgment be entered for the defendant or, in the alternative, that a new trial be granted. Also, the defendant filed a motion to amend the judgment in the event the court overruled the motion to set aside or to grant a new trial.

The order Judge Terry made in ruling on defendant's motions found the southern boundary line of New Madrid County "to be a continuation of a straight line from the mouth of Major's Mill Race, to a point" in the middle of the main channel of the Mississippi River rather than a line at a right angle to the shoreline which presumably would have the effect of locating the land in Pemiscot County so that New Madrid would not have acquired title to the island. This was the only reason assigned by Judge Terry for the grant of the new trial which was ordered in this manner:

"Therefore, it is ordered, adjudged and decreed that defendant's Motion to Amend the Findings and Judgment of the Court in favor of Plaintiffs and against Defendant be overruled.

"It is further ordered, adjudged and decreed that Defendant's Motion to Set Aside Findings and Judgment of Court and to Enter New Judgment in favor of Defendant and against Plaintiffs, or in Lieu Thereof Motion for New Trial be overruled insofar as it constitutes a Motion to Set Aside Findings and Judgment of Court and to Enter New Judgment in Favor of Defendant and Against Plaintiffs; and that the same be sustained insofar as it constitutes a Motion for New Trial.

"And therefore the verdict and judgment of the Court is set aside and for naught held for the reason heretofore stated, and the submission is set aside and the re-trial of this cause is ordered.

"Thereupon it is ordered by the Court that the verdict and judgment heretofore rendered in this cause be and it is hereby set aside and for naught held and the submission is also hereby ordered by the Court set aside and re-trial is ordered."

The defendant did not appeal. The plaintiffs appealed from the order granting a new trial. The plaintiffs' original appellate brief requested that judgment be reinstated or that this court render "such amended judgment as it deems is justified by the evidence." The defendant's appellate brief prayed "that the order and judgment of Judge Terry be sustained and his action affirmed by this court." In their reply brief, the plaintiffs stated their interpretation of the ruling on defendant's motions to be that Judge Terry disagreed with Judge Weber on the location of the county line and that Judge Terry thereby overruled all other specifications of error raised by the after-trial motions of the defendant, citing Loveless v. Locke Distributing Co., Mo., 313 S.W.2d 24, 32. The plaintiffs then contended that the evidence overwhelmingly supported Judge Weber on every issue and stated that there was no contention that a new trial would adduce new evidence and it would be a miscarriage of justice if the parties would have to try the case again and wait another five years for a decision. The reply brief again requested that the original judgment be reinstated or that this court render such amended judgment as it deems is justified by the evidence.

The plaintiffs and the defendant both filed supplemental briefs when the appeal was transferred to the court en banc. The plaintiffs' or the appellants' supplemental brief concluded with this request: "Whereas, the plaintiffs respectfully ask that the proposed opinion be reviewed and set aside

and the findings of trial Judge be reconsidered and affirmed."

The defendant who was the respondent concluded his supplemental brief with this: "Defendant respectfully prays that the proposed opinion be adopted as the opinion in this case."

This state of the record raises serious questions as follows:

1. Since the defendant did not appeal from the judgment of Judge Weber denying the defendant the relief requested in his cross-claim and affirmative defense nor from the order of Judge Terry denying relief except a new trial for the reasons stated by the court, is the defendant entitled to receive in this court the full measure of relief that could have been granted him as an appellant? Ordinarily, a respondent who has not appealed cannot complain of the judgment which, in this case, is the order granting a new trial. See Botto v. James, Mo., 209 S.W.2d 256; State ex rel. Ginger v. Palmer, Mo., 198 S.W.2d 10; Moore v. Hoffman, 327 Mo. 852, 39 S.W.2d 339, 75 A.L.R. 135; Turner v. Hine, 297 Mo. 153, 248 S.W. 933; St. Charles Savings Bank v. Denker, 275 Mo. 607, 205 S.W. 208; and Oertel v. John D. Streett & Co., Mo.App., 285 S.W.2d 87.

2. "It is not the policy of the law to allow long-settled titles to be easily disturbed." Williams v. Keef, 241 Mo. 366, 145 S.W. 425, 427[3]. In that case the claimant waited 27 years before contesting the title. Should this court so easily, and apparently "on its own initiative", disturb a title that has been of record for 40 years and which is buttressed by a statutory presumption of validity? Schlanger v. Simon, supra.

3. If Judge Terry's order granting a new trial is to be sustained, should it be limited to the sole issue of the location of the boundary line between New Madrid and Pemiscot Counties; that is, to the determination of the issue of whether the land is located in New Madrid? See Corbin v.

Hume-Sinclair Coal Mining Co., 361 Mo. 888, 237 S.W.2d 81, 84[7].

For these and other reasons that cannot be adequately developed at this time, I respectfully dissent.